899 A.2d 819

**UNITED SERVICES AUTOMOBILE ASSOCIATION**

v.

**Rita RILEY, et al.**

No. 40, Sept. Term, 2005.

Court of Appeals of Maryland.

June 1, 2006.

58

Andrew Janquitto (Mudd, Harrison & Burch, L.L.P., on brief), Towson, for Petitioner.

Brian S. Brown (Saul E. Kerpelman & Associates, P.A., on brief), Baltimore, for Respondent.

David H. Topol, Laura A. Foggan, Anthony E. Orr, Wiley, Rein & Fielding, L.L.P., Washington, DC, brief of Amicus Curiae Complex Ins. Claims Litigation Ass'n in support of Petitioner.

Bruce M. Bender, Van Crack, Axelson, Williamowsky, Bender & Fishman, Rockville, brief of Amicus Curiae of the Maryland Trial Lawyers Ass'n in support of Respondent.

ARGUED BEFORE BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

GREENE, J.

This matter originated with a complaint for declaratory relief filed by petitioner, United Services Automobile Association ("USAA"), in the Circuit Court for Baltimore City. The complaint named Kenny A. Hooper, Jr. and respondents in the instant case, Rita Towana Riley,[1] Jeremy Carpenter, Christian Carpenter, and Wendy Carpenter ("the Carpenters") as defendants. USAA sought a declaration of the limits of insurance

---

1. Riley is the mother of the Carpenter children and is a party to this appeal individually, and as the children's next friend.

coverage of four consecutive policies issued to Hooper[2] for the property he owned where the Carpenter children allegedly suffered lead exposure and related injuries. Respondents answered USAA's complaint and filed a counterclaim for declaratory relief. Subsequently, USAA filed a motion for summary judgment. The Circuit Court issued a Memorandum and Order granting USAA's motion for summary judgment in part.

The Circuit Court ultimately issued a Declaratory Judgment stating: (1) that the injuries allegedly suffered by the Carpenter children are confined to a single "occurrence," as "occurrence" is defined by the USAA policy; (2) that the Limit of Liability provision of the USAA policy unambiguously limited the recovery of damages because of injury of the Carpenter children to "an aggregate total of the policy limit of $300,000"; (3) that the Carpenter children cannot establish, as a factual matter, that any one of them suffered bodily injury within the meaning of the USAA policies during the terms of the first two policies and therefore, the maximum number of policies implicated is two; (4) that the Limit of Liability provision in the USAA policies is ambiguous and therefore does not limit USAA's responsibility under the two implicated USAA policies to $300,000 for all bodily injury to the Carpenter children; and (5) that to the extent that Hooper is found liable in the underlying tort case, USAA's indemnification obligation is limited to providing no more than $600,000 of liability coverage.

In a reported opinion, the Court of Special Appeals held that the Circuit Court erred in concluding that there was no genuine dispute of material fact as to whether the Carpenter children were injured during the first and second policy periods, and therefore reversed the judgment of the Circuit Court and remanded for further proceedings. *Riley v. United Services Automobile Assoc.*, 161 Md.App. 573, 871 A.2d 599 (2005). The intermediate appellate court, although not re-

---

2. Hooper answered the complaint on December 13, 2001, but is not a party to this appeal.

quired to reach the issue of whether the Circuit Court erred in declaring the amount of coverage USAA's policies provided, addressed the issue in order to provide some guidance to the court and parties on remand.

USAA presents two questions for our review, the first of which we recast:

I. Whether, with regard to the first two USAA policy periods, the Circuit Court erred in granting summary judgment as a result of the respondents' alleged failure to prove that the Carpenter children had suffered injuries, as defined by the policies, during the first two policy periods? [3]

II. Whether a limit-of-liability provision in each of four liability policies issued by the same insurer limits the insurer's liability coverage to a single per occurrence limit when bodily injury spans more than one policy period?

We answer the first question in the affirmative and the second question in the negative and affirm the judgment of the Court of Special Appeals.

## *Facts*

Hooper owned a house located at 1803 West Mosher Street ("the property"), into which the Carpenter children moved in June 1990. At the time they moved into the property, Wendy Carpenter was 2 ½ years old; Christian Carpenter was approximately 1½ years old; and Jeremy Carpenter was 4 months old. While residing at the property, the children were raised by their grandmother, Annie Riley Barksdale. At a

---

**3.** The respondents' original question presented read:

Whether an expert's opinion that bodily injury caused by exposure to lead paint chips, flakes and dust occurred over the course of four consecutive annual policy periods is admissible to defeat summary judgment on the timing of the bodily injury when the only blood lead levels taken were at the beginning of the fourth policy period and the expert admitted that it would be speculative to work backwards from those blood lead levels to pinpoint a specific blood lead level at any particular time?

deposition, Ms. Barksdale stated that she observed problems with the paint in the property, including paint chipping around the window areas in the living room, kitchen, and middle bedroom on the second floor, and paint dust in the bath tub. Ms. Barksdale also witnessed the children gnawing on the window sills in the bedroom. Harriet Peartree, who is Ms. Barksdale's sister, also testified to the condition of the paint at the property, stating that the paint surface was uneven and fragile on the window sills and door frames. While she never witnessed such an occurrence, on multiple occasions, the children told her that "one of the kids is eating the paint" which she believed occurred in either Ms. Barksdale's bedroom or the middle bedroom.

In April 1993, Wendy Carpenter first tested for elevated blood lead levels and her level was 19 micrograms per deciliter ("μg/dL")[4], which increased to 23 μg/dL in September 1993. In May 1993, Christian Carpenter's initial blood lead level was 23 μg/dL, which increased in June 1993 to 24 μg/dL, and in September 1993 to 28 μg/dL. Jeremy Carpenter's initial blood lead level was 29 μg/dL in April 1993, and after a series of increases and decreases,[5] declined to 18/19 μg/dL by December 1993. The Carpenter children moved out of the property in the Fall of 1993.

During the respondents' tenancy at the property, USAA insured Hooper under a series of homeowner's policies. The

---

**4.** The measurement of blood levels is noted in micrograms per deciliter of blood, or "μg/dL." As noted by the intermediate appellate court, the "safe" level of lead has continually dropped over the years, and currently, the Centers for Disease Control and Prevention ("CDC") have jurisdiction over lead poisoning prevention and have lowered the level of concern to 10μg/dL. *See Riley, supra,* 161 Md.App. at 577, 871 A.2d at 601 (citing Scott A. Smith, Turning Lead into Asbestos and Tobacco: Litigation Alchemy Gone Wrong, Defense Counsel Journal, Apr. 2004, at 123).

**5.** Jeremy's blood lead level registered the following: (1) decrease from 29 μg/dL in April 1993 to 26 μg/dL in July 1993; (2) increase from 26 μg/dL in July 1993 to 32 μg/dL in September 1993; (3) decrease from 32 μg/dL in September 1993 to 24/25 μg/dL in October 1993; and (4) decrease from 24/25 μg/dL in October 1993 to 18/19 μg/dL in December 1993.

first policy began on July 28, 1990 and was renewed on July 28, 1991. In March of 1992, some changes were made to the policy and a new policy was issued that covered March 1, 1992, until March 1, 1993. That policy was then renewed from March 1, 1993, until March 1, 1994. The USAA policies defined "bodily injury" as "bodily harm, sickness or disease, including required care, loss of services and death that results." "Occurrence" was defined as

an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

a. bodily injury; or

b. property damage.

Personal liability was addressed by the USAA policies as follows:

SECTION II—LIABILITY COVERAGES

Coverage E—Personal Liability

[If] a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the insured is legally liable; and

2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is inappropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the occurrence equals our limit of liability.

\* \* \* \*

SECTION II—CONDITIONS

1. Limit of Liability. Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of insureds, claims made or persons injured. All bodily injury and property damage resulting

from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one occurrence.

Each of the policies provided $300,000 of liability coverage.

Respondents filed a cause of action against Hooper alleging that he negligently exposed the Carpenter children to lead paint during their tenancy which resulted in brain damage to the Carpenter children. During the discovery process, a dispute arose as to the applicability of Hooper's insurance policies for the property, and USAA filed a complaint for declaratory relief on October 12, 2001, naming as defendants Riley, the Carpenters, and Hooper to resolve the insurance issue. USAA asked the Circuit Court to issue a declaration limiting insurance coverage to $300,000. Respondents claimed that Hooper was insured for $3,600,000 for their injuries under the series of policies.

USAA filed a Motion for Summary Judgment alleging that respondents could not prove that any bodily injuries were sustained before March 1, 1992, during the first and second policy periods. The Circuit Court issued a Memorandum and Order, granting summary judgment in part:

The court determines, for the reasons stated by [USAA] in its memoranda, that the language of the policy defining an "occurrence" unambiguously confines [respondents'] exposure to a single occurrence. Similarly, the policy's "Limit of Liability" unambiguously limits the recovery of [the Carpenter children] to an aggregate total of the policy limit of $300,000. Accordingly, the total coverage for [the Carpenter children's] exposure under a single policy is $300,000.

The remaining issue of whether a single policy limit of $300,000 is available for the four policy periods or whether the limit is available in each of the four policy periods is ambiguous under the terms of the policies and, for that reason, cannot be resolved by this Court on summary judgment as a matter of law. However, as a factual matter, on the record before the Court, the [Carpenter children] cannot establish that any one of them suffered a bodily

injury within the meaning of the policies during the term of the first two policies, *i.e.* July 28, 1990 to March 1, 1992. Therefore, as a factual matter, the maximum number of policies implicated is two.

Accordingly, [USAA] is entitled to summary judgment to the extent that it seeks to limit its exposure to a single occurrence (including all three [Carpenter children]) over two policy periods for a total exposure in the amount of $600,000. Summary judgment is GRANTED to the extent discussed and DENIED in all other respects.

Ultimately, the Circuit Court issued the following Declaratory Judgment, dated February 21, 2003:

\* \* \* \*

3. The injuries allegedly suffered by the Carpenter children while in or about 1803 West Mosher Street were caused by one "occurrence" as defined by the USAA policies. The definition of "occurrence" in the USAA policies confines the Carpenter Childrens' injuries allegedly suffered by them while in or about 1803 West Mosher Street to a single "occurrence." Similarly, the Limit of Liability provision unambiguously limits the recovery of damages because of injury to all three Carpenter Children to an aggregate total of the policy limit of $300,000. Accordingly, the total coverage for damages for the three Carpenter Children's injuries under a single policy is $300,000.

4. As a factual matter, on the record before the Court, the three Carpenter Children cannot establish that any one of them suffered bodily injury within the meaning of the USAA policies during the terms of the first two policies, i.e., July 28, 1990 to March 1, 1992. Therefore, as a factual matter, the maximum number of USAA policies implicated is two.

[5]. The Limit of Liability provision in the USAA policies is ambiguous and therefore does not limit USAA's responsibility under the two implicated USAA policies to $300,000 for all bodily injury to all of the Carpenter Children.

[6.] To the extent that Kenneth Hooper is found liable in the underlying case, USAA's indemnification obligation is

limited to providing no more than $600,000 of liability coverage.

[7.] This declaratory judgment is confined solely to the issues of the number of "occurrences," when "bodily injury" occurred, and the meaning and applicability of the limit of liability provision in the USAA policies. This declaratory judgment does not determine or address the merits of [the respondents'] claims against Hooper in the underlying litigation.

Respondents appealed the judgment of the Circuit Court to the Court of Special Appeals. The intermediate appellate court reversed the Circuit Court and remanded the matter back to that court for further proceedings. USAA appealed that decision, and this court granted certiorari. *United Services Automobile Assoc. v. Riley*, 388 Md. 97, 879 A.2d 42 (2005).

## STANDARD OF REVIEW

■■■■■ Maryland Rule 2–501 indicates that a motion for summary judgment is appropriate "on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." A motion for summary judgment may be supported by affidavit. When reviewing the grant or denial of a motion for summary judgment we must determine whether a material factual issue exists, and all inferences are resolved against the moving party. *King v. Bankerd*, 303 Md. 98, 110–111, 492 A.2d 608, 614 (1985) (citing *Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 7–8, 327 A.2d 502, 509 (1974)). " '[E]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact.' " *King v. Bankerd*, 303 Md. at 111, 492 A.2d at 614 (quoting *Porter v. General Boiler Casing Co.*, 284 Md. 402, 413, 396 A.2d 1090, 1096 (1979) (citations omitted)). The function of a summary judgment proceeding is not to try the case or to

attempt to resolve factual disputes but to determine whether there is a dispute as to material facts sufficient to provide an issue to be tried. *Honaker v. W.C. & A.N. Miller Development Co.*, 285 Md. 216, 231, 401 A.2d 1013, 1020 (1979) (citing *Dietz v. Moore*, 277 Md. 1, 4–5, 351 A.2d 428 (1976)). A "material fact" is one which will somehow affect the outcome of the case. *Id.* (citation omitted).

An appellate court reviewing a summary judgment examines the same information from the record and determines the same issues of law as the trial court. *PaineWebber Inc. v. East*, 363 Md. 408, 413, 768 A.2d 1029, 1032 (2001) (citation omitted). We are often concerned with whether a dispute of material fact exists when reviewing the grant of a summary judgment motion. *Lippert v. Jung*, 366 Md. 221, 227, 783 A.2d 206, 209 (2001) (citing *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 144, 642 A.2d 219, 224 (1994)). We recently reiterated the standard of review for a trial court's grant or denial of a motion for summary judgment in *Myers v. Kayhoe*, 391 Md. 188, 892 A.2d 520 (2006):

> The question of whether a trial court's grant of summary judgment was proper is a question of law subject to *de novo* review on appeal. *Livesay v. Baltimore*, 384 Md. 1, 9, 862 A.2d 33, 38 (2004). In reviewing a grant of summary judgment under Md. Rule 2–501, we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Id.* at 9–10, 862 A.2d at 38. We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party. *Id.* at 10, 862 A.2d at 38.

*Id.* at 203, 892 A.2d at 529.

## DISCUSSION

### I.

Whether, with regard to the first two USAA policy periods, the Circuit Court erred in granting summary judgment as a

result of the respondents' alleged failure to prove that the Carpenter children had suffered injuries, as defined by the policies, during the first two policy periods?

Petitioner argues that respondents provided no admissible evidence that exposure to lead resulted in bodily injury in the first and second policy periods of the USAA policies and thus, failed to produce adequate evidence to refute USAA's summary judgment motion.[6] Howard M. Klein, M.D., was named as an expert witness in the underlying tort action and gave his first deposition on May 23, 2001. In testifying regarding Wendy Carpenter's blood lead levels, Dr. Klein stated that Wendy's exposure to lead began a few months before she was first tested for lead exposure. Dr. Klein's rationale for this opinion was based on the fact that it would take a certain period of time to reach Wendy's tested level of 19 $\mu$g/dL in September 1993. Specifically, Dr. Klein opined:

It takes a while to get to 19. You can do it, I guess, if you take a shotglass full of chips at once, but I'm usually of the opinion that to get into 20, if you're talking about a little or moderate hand to mouth activity and some lead dust, it takes you a couple of weeks to get there. So, at least March of '93 to, at least, through most of the year of '93.

Dr. Klein testified that Jeremy Carpenter's lead exposure began in April 1993, and that Christian Carpenter's lead exposure began a few weeks prior to May 1993. As a result,

----

**6.** Respondents strenuously argue that the Circuit Court's Memorandum and Order granting, in part, USAA's motion for summary judgment makes no mention of the inadmissibility of Dr. Klein's testimony. The order partially granting summary judgment, however, directly implicates the dates upon which the Carpenter children sustained an "injury" as defined by the policies. Dr. Klein's expert testimony was principally admitted to establish when the Carpenter children began to suffer "injuries" as a result of their lead exposure. The Circuit Court's finding that the respondents did not prove injury during the first two policy periods clearly disregards Dr. Klein's theory that the children did suffer injury. We can logically conclude that the court considered, but chose not to accept, Dr. Klein's testimony as to that issue. Though not specifically mentioned in the court's order, we shall address the admissibility of Dr. Klein's opinion as it is clearly stated in the record below. Md. Rule 8–131(a).

USAA contends that there is no proof that any of the children were exposed to lead during the first two policy periods (and that Christian's level did not indicate injury even during the third policy period).

In response to USAA's argument that the respondents could not prove bodily injury during the first two policy periods, the respondents submitted an affidavit from Dr. Klein. Petitioner alleges that this affidavit contradicts Dr. Klein's initial deposition testimony. In the affidavit, with regard to the Carpenter children's lead exposure, Dr. Klein noted:

[The testimony of the respondents, Ms. Barksdale and Peartree] establishes that beginning the first year the family moved into [the property,] the property contained deteriorated, chipping and flaking paint and dust hazards in the windowsills and bathtub. Moreover, the Carpenter children would gnaw on the windowsills and one of the children was observed by the other children eating paint.

[A]ssuming that this information is true and correct, it is my opinion within [a] reasonable degree of medical probability that Christian Carpenter and Wendy Carpenter were "exposed" to hazardous lead-based paint and dust at [the property] beginning on the date they first moved into the property in June 1989. Likewise, it is my opinion within a reasonable degree of medical probability that Jeremy Carpenter was "exposed" to hazardous lead-based paint and dust at [the property] beginning in utero and continuing at his birth[.] By exposure, I mean inhaling and/or ingesting lead-based paint and dust into the body, lungs and bloodstream. It is my further opinion within a reasonable degree of medical probability that this exposure for all three children caused damage on a cellular level to the children's brain, disrupting normal cellular development. These opinions are based on the deteriorated condition of the lead-based paint while the children resided at the property, evidence of hand to mouth activity, gnawing on leaded paint, as well as actual observation of ingestion of leaded paint chips.

[A]n injury is the alteration of structure or function of a cell, tissue or organ. Physical or chemical damage to the body which may be detectable only on a microscopic or sub clinical level also constitutes an injury. There are injuries to cells, tissues and organs caused by exposure to lead paint, lead paint chips, lead paint fumes, and/or lead paint dust, even though the injuries may not be noticeable to a harmed individual or diagnosable by a clinician until some later point in time.

Lead is especially harmful to the developing brain and nervous systems of fetuses. There is probably no safe threshold at which lead has no effect [on] children under age five, whose brains are rapidly growing and developing are most vulnerable to damage by low levels of lead exposure .... [infants and toddlers below the age of five years] may be suffering from the effects of cumulative low-level lead exposure years before they are clinically observable.

Essentially, Dr. Klein testified that all of the children were exposed to lead during each of the four policy periods, and therefore, suffered the requisite bodily injury to trigger the policy coverage. Dr. Klein was deposed a second time on December 18, 2002, and his responses on that date are discussed below.

■■■■ USAA argues that Dr. Klein's testimony lacked a sufficient factual basis that was not the result of reliable principles and methods as required by Md. Rule 5–702.[7] USAA asks this Court to discount Dr. Klein's opinion because he gave no explanations for his conclusions and because Dr. Klein's initial deposition testimony was allegedly contradicted

---

7. Maryland Rule 5–702 governs the admission of expert testimony:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

by his affidavit and later deposition, and is therefore unreliable.

We shall address the reliability argument first. During the motions hearing for USAA's motion for summary judgment on January 8, 2003, respondents' counsel offered the following explanation for the alleged "contradiction" in Dr. Klein's affidavit and deposition testimony:

[W]hat really is this supposed contradiction in Dr. Klein's testimony is not contradiction at all ... [b]ecause the original questions that he was asked were based on a false premise ... that in order to establish exposure you have to have lead levels.... [T]he children had certain lead levels and the Doctor was asked a limited question; ["W]ell, the child has a lead level of 20, can you tell us from the lead level of 20 itself how long that means the child is being exposed to lead." And then he gives basically an answer that says[, "I] can't say exactly, but it means at least a couple of months of exposure." But he also says[, "W]ell, from the 20 by itself, all I can be ... absolutely certain of ... is that the exposure had gone on for at least two months." But he wasn't asked—the premise of that question is, you have to have a lead level in order to show that the child's had exposure.... The testimony that we have offered in our affidavits from the mom and from the aunt is that from the day they moved in the house there was chipping and flaking paint all [over] the place. And that the children were mobile all around the house, that the children had a lot of hand-to-[mouth] activity that they were actually seeing, I think on more than one occasion, to put paint chips in their mouths.... And then during that whole early time they're not testing for lead, but the house is in horrible condition. It's reasonable to assume and I think that the finder of [fact] can assume that there's lead dust all over the house. The Health Department goes in and inspects and the Health Department, which are going to be an independent witness in the case, says there's 83 separate locations in this house where there's chipping and flaking paint that's a health hazard that's liable to poison children.

It appears that counsel for respondents was arguing that, at the initial deposition on May 23, 2001, Dr. Klein was not asked about the beginning date of the children's exposure overall, but rather, the beginning date of the exposure in relation to the children's measured lead levels. While the record does not contain the May 2001 deposition in its entirety, certain pages are included in the Record Extract. It appears that the question posed to Dr. Klein regarding Wendy's lead exposure referred specifically to the time frame of her testing:

> **[COUNSEL FOR USAA]: [W]ell, we're talking about certain levels here and it's my understanding that you have a level of 19 and then five months later a level of 23. So, those are the specific levels that we're talking about.**
>
> Are you saying that we are talking about those levels that the age is between six and ten for children, that would create the same effect that you just described or is it any different for those levels?
>
> [DR. KLEIN]: I think it can be significant. In the literature that you asked me to show you before, the [Centers for Disease Control], a writing in October of '91, it's quoted that anything over ten micrograms per deciliter is being the threshold for action and these lead levels are well above that.
>
> There are also levels which have been widely discussed in the literature as levels of concern. So ... I think that that's the ballpark we're talking about.
>
> * * * *
>
> [COUNSEL FOR USAA]: **[Y]ou have the two [lead] levels in April and September of '93, 19 and 23 [μg/dL].**
>
> [DR. KLEIN]: Right.
>
> **[COUNSEL FOR USAA]: Do you have an opinion whether she was actually being exposed to lead during that time[ ]frame?**
>
> [DR. KLEIN]: Well, for sure several months before '93 through several months after September of '93. So, we have at least the year of '93 as a period of exposure.

(Emphasis added.) Dr. Klein was also asked about Jeremy's and Christian's exposures in the same manner, and answered accordingly. Simply because Dr. Klein's answers were responsive to the questions asked, and he later expanded his testimony regarding the children's potential exposure to lead, does not mean that Dr. Klein's testimony was so contradictory as to be unreliable.

At his second deposition on December 18, 2002, Dr. Klein was questioned again about estimating the beginning of each child's lead exposure:

[COUNSEL FOR USAA]: Okay. Are you able to discern and somehow work backwards—from the reading Jeremy had in April of '93 where he had a 29 [μg/dL], are you able to work backwards from that lead level to determine what Jeremy's blood level was at any discrete point in time before that?

[DR. KLEIN]: Only to opine that—as I have previously in these kinds of depositions, that I believe that the exposure was ongoing if he was living in a leaded property, but I cannot give you a specific number.

[COUNSEL FOR USAA]: And the same would be true for Christian and Wendy?

[DR. KLEIN]: Yes.

\* \* \* \*

[COUNSEL FOR USAA]: Okay. Can you give me an estimate [of when Wendy first got to level 10 μg/dL]?

[DR. KLEIN]: It could be months to years. I mean, it could have crept up slowly. It could have been stable for a long time. It would be speculation for me to tell you exactly when it started.

Dr. Klein made similar statements about the estimation of when Jeremy and Christian reached the level of 10 μg/dL.

Dr. Klein testified that he could not speculate as to the exact date when Wendy reached 10 μg/dL. This does not preclude a reasonable person from concluding that Wendy, or the other children, suffered injuries during the first two policy periods because they were ingesting lead paint chips and dust.

Further, other evidence could be admitted at trial that would clarify or rule out some of the issues about which Dr. Klein refused to speculate. Dr. Klein's expansion of his testimony, noting that **any** exposure to lead causes damage on the cellular level which would equate to an "injury" as defined by the USAA policies, does not amount to contradiction. Even assuming the contradiction, the seemingly contradictory statement is a matter for resolution by the trier of fact, and not the judge ruling on summary judgment.

 We turn now to petitioner's contention that Dr. Klein's testimony lacked a sufficient factual basis that was not the result of reliable principles and methods. In his affidavit, Dr. Klein testified:

> There is probably no safe threshold at which lead has no effect [on] children under age five, whose brains are rapidly growing and developing are most vulnerable to damage by low levels of lead exposure ... [infants and toddlers below the age of five years] may be suffering from the effects of cumulative low-level lead exposure years before they are clinically observable.

At his second deposition, Dr. Klein was questioned as to his contention that any exposure to lead, even exposure that does not result in the "level of concern" established by the CDC at 10 μg/dL, is harmful:

> [COUNSEL FOR USAA]: Why don't you just tell me generally ... how does lead affect a child during developmental years?
>
> [DR. KLEIN]: Okay. Lead is a heavy metal. It's widely distributed in the environment[.] By statute, it was forbidden federally and on a statewide level because it was found that lead was toxic.
>
> * * * *
>
> [COUNSEL FOR USAA]: Okay. What about for concentrations under 10 [μg/dL]?
>
> [DR. KLEIN]: **We do not believe that any level of lead is safe,** but we can only opine, I guess, for now what we see clinically. There are studies, good studies, from good cen-

ters down to levels of 15 [µg/dL], and there are ongoing studies as to effect below ... ten, including fetal life, but there's nothing that we can clinically use at this point.

[COUNSEL FOR USAA]: Okay. What studies are those?

[DR. KLEIN]: The 15 [µg/dL] is a study which I've probably quoted to [counsel for Hooper] before from Mendelson & Dryer from the Journal of Behavioral & Developmental Pediatrics, December '99, which showed ... increased learning problems in preschoolers exposed to leads as low as 15 [µg/dL].

The fetal studies, I would have to look up the reference, but there are notation of cord leads that have been taken, and I can't give you a reference off the top of my head.

[COUNSEL FOR USAA]: Okay. And what about the ongoing studies with regard to levels less than 10 [µg/dL], do you know where they're being conducted?

[DR. KLEIN]: Again, I'd have to look it up.

[COUNSEL FOR USAA]: Okay. And where would you look that up?

[DR. KLEIN]: Well, I would start with that article I quoted you, the developmental article from ... Davoli & Chisolm from the Brooks textbook [that was attached to the earlier deposition and] there are other studies that ... would be in a more recent bibliography.

\* \* \* \*

[COUNSEL FOR USAA]: You had indicated that it's your belief that there's no lead level below—even below ten that is safe; is that correct?

[DR. KLEIN]: Yes.

[COUNSEL FOR USAA]: Okay. And do you base that opinion on any particular literature?

[DR. KLEIN]: It's a toxin. So, I mean, we can't measure what a lead level of five or six does, but I think that we're talking about an area that's unknown and—but not a specific paper. I know that there is a consideration—and I don't know when it's going to happen, but there was a consider-

ation for the CDC to revise their 1991 guidelines to even go below ten.

Dr. Klein testified that he was uncertain of the details of this change, or if it would in fact happen. When asked if every exposure to lead results in injury, Dr. Klein testified that he could not state that an exposure does not cause problems.

The Court of Special Appeals rejected USAA's argument that Dr. Klein's opinion regarding injuries sustained when a child's lead level is below 10μg/dL was properly excluded. In its examination of the issue, the intermediate appellate court cited to our decision in a nearly factually identical lead paint case, *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 656 A.2d 779 (1995). The appeal in *Chantel* resulted from a declaratory judgment action commenced by several insurers to establish that each had no duty to defend or indemnify Chantel Associates in a tort action arising from injuries sustained from exposure, ingestion and consumption of lead paint by children who resided at Chantel's property. *Chantel*, 338 Md. at 135, 656 A.2d at 781. Each of the general liability insurance policies issued to Chantel required the insurer to

"pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury caused by an occurrence"... The policies define "bodily injury" as: "bodily injury, sickness or disease" The policies define an "occurrence" as: "an accident, including continuous or repeated exposure to conditions, which results in bodily injury neither expected nor intended from the standpoint of the insured."

*Id.* at 136–37, 656 A.2d at 782 (footnote omitted). Chantel filed a motion for summary judgment to establish that each of the insurance companies that represented it had a duty to defend, and this motion was supported by the affidavit of psychologist Stephen R. Schroeder. The affidavit stated:

"An injury is the alteration of structure or function of a cell, tissue or organ. Physical or chemical damage to the body which may be detectable only on a microscopic or subclinical

level also constitute[s] an injury ... [T]here are injuries to cells, tissues and organs caused by exposure to lead paint, lead paint chips, lead paint fumes, and/or lead paint dust, even though the injuries may not be noticeable to a harmed individual or diagnosable by a clinician until some later point in time.... Thus they may be suffering from the effects of cumulative low level lead exposure years before they are clinically observable.... Thus, it is my opinion ... that exposure to lead produces both direct and indirect damage to the cells, tissues and organs of the body that begin immediately or shortly after exposure, notwithstanding the fact that the symptoms, especially at low levels of exposure, may not be apparent until much later, sometimes years after exposure."

*Id.* at 138–39, 656 A.2d at 782–83. This affidavit was uncontroverted. We next examined the meaning of "bodily injury:"

In [*Mitchell v. Maryland Casualty,* 324 Md. 44, 56, 595 A.2d 469, 475 (1991)], we were called upon to interpret the term "bodily injury" under a general liability insurance policy. In so doing, we relied on the definitions accorded that term by other courts. We relied on *Zurich Ins. v. Northbrook Excess & Surplus,* 145 Ill.App.3d 175, 98 Ill.Dec. 512, 520, 494 N.E.2d 634, 642 (1986), which held that "the plain meaning of the term 'bodily injury' is harm or damage of, or relating to the body." We further looked to *Ins. Co. of North America v. Forty–Eight Insulations,* 633 F.2d 1212, 1222 (6th Cir.1980), which noted that "for insurance purposes, courts have long defined the term 'bodily injury' to mean 'any localized abnormal condition of the living body' " (citing APPLEMAN, INSURANCE LAW AND PRACTICES § 355 (1965)). *See Mitchell,* 324 Md. at 58–62, 595 A.2d at 476–78. Although we were interpreting the term "bodily injury" in the context of asbestos-related injuries in *Mitchell,* we accorded the term its "ordinary and accepted" definition under a general liability insurance policy.

*Id.* at 144, 656 A.2d at 785–86. We held in *Chantel* that, because the language in one of the policies was identical to the policy language in *Mitchell,* the term "bodily injury" must be

accorded the same meaning as it was accorded in *Mitchell. Id.* The tort complaint filed by the injured children in *Chantel,* in addition to Dr. Schroeder's undisputed affidavit, established that the "direct and indirect damage to the cells, tissues and organs" caused by exposure to lead constituted a "bodily injury" as that term was defined in *Mitchell.* We held that this evidence was sufficient to establish that the children in *Chantel* suffered injury as soon as they were exposed to the lead paint, and that those injuries successfully triggered the respective policies that covered the property during their occupancy.

In the instant case, Dr. Klein's testimony was admitted for the purpose of determining whether each of the four insurance policies were triggered. Contract interpretation is undoubtedly a question of law that may be properly determined on summary judgment. In order to determine when the policies were triggered, however, evidence must be shown that the children suffered "injuries" as defined by the policies. *Chantel* and the instant case, on the issue of proof of bodily injury, are nearly factually identical, and thus, we find *Chantel* dispositive. In the instant case, the definition of "bodily injury" is identical to that in *Chantel* and, as such, bodily injury can be said to mean any localized abnormal condition of the living body. Dr. Klein testified, uncontroverted, that it was his understanding that lead was a toxin, and any exposure results in cellular damage that might not be detectable initially. There is clearly enough evidence considering Dr. Klein's testimony, in addition to the testimony that the Carpenter children were ingesting lead paint from the time that they moved into the property, to demonstrate injury as defined in the USAA policy. This clearly constituted a dispute of material fact.

## II.

Whether a limit-of-liability provision in each of four liability policies issued by the same insurer limits the insurer's liability coverage to a single per occurrence limit when bodily injury spans more than one policy period?

Petitioner contends that the Circuit Court erred when it ruled that the USAA policies were ambiguous with regard to whether the total available from all implicated policies was $300,000. USAA also disputes the conclusion of the Court of Special Appeals that the limit of liability of the USAA policies constituted the combined limit of the four potentially triggered policies, and not the limit of a single policy.

USAA contends that each of the policies contained a limit-of-liability clause designed to limit USAA's exposure and prevent the "stacking" of policy limits. USAA argues that this provision clearly limits USAA's liability to a maximum of $300,000 for all damages because of the injuries allegedly suffered by the three Carpenter children regardless of when they suffered that injury. The respondents counter that the controlling term is the definition of "occurrence." In each policy, "occurrence" is defined as "bodily injury ... which occurs during the policy period." Respondents argue that it is by this mechanism that each policy is made a discrete entity.

■■■■■ Contract interpretation, including the determination of the ambiguity of a contract, is a question of law and subject to *de novo* review. *Towson University v. Conte,* 384 Md. 68, 78, 862 A.2d 941, 946 (2004) (citing *Sy–Lene v. Starwood,* 376 Md. 157, 163, 829 A.2d 540, 544 (2003)). Insurance contracts are treated as any other contract, and we measure such an agreement by its terms. In order to determine the intention of the parties to an insurance contract, the instrument must be construed as a whole and "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution" must be examined. *Chantel, supra,* 338 Md. at 142, 656 A.2d at 784 (quoting *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 488 A.2d 486 (1985) (citations omitted)). Courts in Maryland follow the law of objective interpretation of contracts, "giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean." *Towson University v. Conte,* 384 Md. at 78, 862 A.2d at 946–47.

[W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean.

*Id.* at 78, 862 A.2d at 947. A contract is ambiguous if, "when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358, 363 (1999) (citations omitted). Determining whether language in a contract is susceptible to more than one meaning requires an examination of " 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution' " *Id.* (quoting *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 388, 488 A.2d 486, 488 (1985)). The determination of coverage under an insurance policy requires an examination of the policy to determine the scope and limitations of its coverage. *Chantel,* 338 Md. at 142, 656 A.2d at 784 (citations omitted). We must accord the terms of the insurance contract their " 'customary, ordinary, and accepted meaning.' " *Id.* at 142, 656 A.2d at 784–85 (quoting *Mitchell v. Maryland Casualty,* 324 Md. 44, 56, 56, 595 A.2d 469, 475 (1991)).

 We begin our analysis with the language of the policies that are at issue. The limit-of-liability provision in each of the policies states:

Limit of Liability. Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of insureds, claims made or persons injured. All bodily injury and property damage resulting from any one accident or from continuous or repeated exposure to sub-

stantially the same general harmful conditions shall be considered to be the result of one occurrence.

There is no reference here to subsequent policies. The plain language of the policies defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, **during the policy period,** in bodily injury or property damage." (Emphasis added). While "policy period" is not defined within the "definitions" section of the policy, on the "Declarations Page" at the beginning of each policy the words "POLICY PERIOD" appear, followed by the dates that the policy covers. Each policy in the record contains a set "policy period." The customary, ordinary, and accepted meaning of a policy period is the period in time that is covered by the policy. It appears from the language of the contact that occurrences that happen during a policy period are covered. While USAA insists that its intent to prevent the stacking of multiple policies is clearly manifested in the language of the policy, it is clear that a reasonably prudent person could also read the policies to mean that each separate policy is implicated by a continuing occurrence. These contradictory interpretations of the same language clearly demonstrate the ambiguity in the policy. We find no error in the Circuit Court's determination.

USAA erroneously contends that *Hiraldo v. Allstate Insurance Company,* 8 A.D.3d 230, 778 N.Y.S.2d 50 (2004), *leave to appeal granted by Hiraldo v. Allstate Ins. Co.,* 4 N.Y.3d 704, 792 N.Y.S.2d 1, 825 N.E.2d 133 (2005), *aff'd, Hiraldo ex rel. Hiraldo v. Allstate Ins. Co.,* 5 N.Y.3d 508, 806 N.Y.S.2d 451, 840 N.E.2d 563 (2005), addressed the exact issue as in the instant case. In *Hiraldo,* a child was exposed to lead paint chips and caused to suffer injury over the course of several years and several homeowner's insurance policy periods. *Id.* at 51. Allstate Insurance Company insured the landlord of the premises where the infant resided under a Landlord Policy. *Id.* The infant suffered brain damage as a result of lead poisoning, which was first diagnosed in August of 1991 when he was one year old. Continuously elevated lead levels were found in the infant's blood on seven occasions, with a

final diagnosis in January 1993. *Id.* Allstate contended that, while it insured the premises in question for a $300,000 liability limit per person, and two subsequent renewal policies identical to the initial policy, the provisions of the applicable policy clearly limited the plaintiffs to the recovery of the limit of one policy period, i.e., $300,000. *Id.* The *Hiraldo* court held that the plain language of the policy determined that the infant's injuries arose out of a single occurrence and constituted one loss, and Allstate "clearly intended to limit the number of policies that would be available to satisfy a judgment in a continuous exposure case." *Id.* at 51–52. Thus, the limits of liability provision did apply.

The "Limits of Liability" provision in the policy in *Hiraldo*, while similar to the provision in the instant case, contains one important difference. The provision reads: **"Regardless of the number of** insured persons, injured persons, claims, claimants **or policies** involved, our total liability ... coverage...." *Hiraldo,* 778 N.Y.S.2d at 51 (emphasis added). Unlike the provision in the instant case, the *Hiraldo* provision clearly indicated that liability was limited regardless of the number of policies implicated. In the instant case, USAA made no reference to the implication of the limit of liability provision in the event of multiple policies. In its affirmance of *Hiraldo,* the Court of Appeals of New York even cited to the intermediate appellate court's opinion in the instant case and distinguished it, noting that "[s]ome courts have held that successive policy limits may be cumulatively applied to a single loss, where the policies do not clearly provide otherwise.... *Riley v. United Servs. Auto. Assn.,* 161 Md.App. 573, 871 A.2d 599 [Ct Spec App 2005]." This is clearly not the situation present in the instant case.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**