929 A.2d 932

DIAMOND POINT PLAZA LIMITED PARTNERSHIP, et al.

v.

WELLS FARGO BANK, N.A.

Wal–Mart Stores, Inc. and Sam's PW, Inc.

v.

Wells Fargo Bank, N.A.

Nos. 126, 128, Sept. Term, 2006.

Court of Appeals of Maryland.

Aug. 23, 2007.

Reconsideration Denied Sept. 7, 2007.

720

722

Benjamin Rosenberg (Gerard P. Martin, Andrew H. Baida and Shannon M. Chilcoate of Rosenberg, Martin, Greenberg, L.L.P. of Baltimore, MD; C. William Clark and Robert L. Hanley, Jr. of Nolan, Plumhoff & Williams, Chtd. of Townson, MD), on brief, for Petititoners (case no. 126).

K. Donald Proctor (Margaret M. McKee of Proctor & McKee, P.A. of Townson, MD; Jeff Joyce of Winstead P.C., of Houston, Texas), on brief, for Respondent (case no. 126).

Donald A. Rea (Michelle N. Lipkowitz of McGuire Woods, L.L.P. of Baltimore, MD), on brief, for Petitioners/Cross–Respondents (case no. 128).

Jeff Joyce (Winstead P.C. of Houston, Texas; K. Donald Proctor, Margaret M. McKee of Proctor & McKee, P.A. of Townson, MD), on brief, for Respondent/Cross–Petitioner, (case no. 128).

Argued Before BELL, C.J., and RAKER, CATHELL * HARRELL, BATTAGLIA, GREENE, WILNER, ALAN M. (Retired, Specially Assigned), JJ.

## ORDER

ROBERT M. BELL, Chief Judge.

The Court having considered motions for reconsideration filed in the above-captioned cases, it is this 23rd day of August, 2007,

**ORDERED,** by the Court of Appeals of Maryland, that the motions for reconsideration be, and they are hereby, granted, and it is further

---

* Cathell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

**ORDERED** that the Opinion in these appeals filed on July 26, 2007, be, and it is hereby, recalled and a new Opinion dated August 23, 2007, filed simultaneously with this Order, shall replace the Opinion filed July 26, 2007.

WILNER, J.

This litigation arose when, in November, 2002, Diamond Point Plaza Limited Partnership (Diamond Point), the owner of the Diamond Point Plaza shopping center in eastern Baltimore County, defaulted on a mortgage loan that was secured by the shopping center property. Wells Fargo Bank, as trustee for the assignees of the mortgage, sued two sets of defendants: Michael C. Konover and entities in which he had some interest, including Diamond Point, and Wal–Mart Stores, Inc. and entities affiliated or associated with it.[1]

---

1. The defendants are as follows:

(1) Diamond Point Plaza Limited Partnership (Diamond Point), a Maryland limited partnership which owned the Diamond Point Plaza shopping center.

(2) Oriole Commercial Associates Limited Partnership (Oriole), a Connecticut limited partnership, which, as general partner, owned a 50% interest in Diamond Point.

(3) American Way Commercial Associates Limited Partnership (American Way), which, as a limited partner, owned the other 50% interest in Diamond Point.

(4) Diamond Point Management Corporation (DPMC), a Connecticut corporation, which was a general partner and 1% owner of Oriole.

(5) Konover Management Corporation (KMC), a Connecticut corporation, which, until November 26, 2002, managed the shopping center pursuant to an agreement with Diamond Point.

(6) MCK, Inc., a Connecticut corporation, which was alleged to have received rents from Diamond Point that should have been paid over to Wells Fargo.

(7) Michael Konover who was alleged to be a principal in Diamond Point. It was later stipulated that Konover owned

(i) 100% of KMC,

(iii) 100% of DPMC,

(iv) approximately 86% of Oriole,

(v) 100% of MCK, Inc., and

(vi) apparently through his ownership in some of these entities, approximately 93% of Diamond Point.

(8) Wal–Mart, an Arkansas corporation, which allegedly entered into an agreement with The Wire Productions, Inc. in connection with the

The actions against the Konover defendants, pled in Counts 1 through 6, were to recover losses sustained on the mortgage loan and certain rents collected from shopping center tenants. The action against the Wal–Mart defendants, pled in Counts 7 through 12, was to recover damages for alleged lease violations by Sam's Club, a major tenant of the shopping center, and lease violations and tortious conduct by Wal–Mart itself. On August 15, 2005, following a non-jury trial and certain earlier rulings, including a partial summary judgment in favor of the Wal–Mart defendants, the Circuit Court for Baltimore County filed extensive written findings of fact and conclusions of law. On December 5, 2005, based on those findings, the court entered three sets of judgments in the case, as follows:

(1) With respect to the claim for losses sustained on the mortgage loan, the court entered judgment in favor of Wells Fargo and jointly and severally against Diamond Point, Oriole, DPMC, and KMC in the amount of $22,862,399, representing the total loan debt as of April 4, 2005, plus pre-judgment interest of $811,931, accounting from April 5, 2005.[2] The judgment against all defendants but KMC was for intentional misrepresentation and gross negligence. The judgment against KMC was based on its status as guarantor of recourse

use of a portion of the Diamond Point Plaza shopping center as a studio for a television series.

(9) Sam's PW, an Arkansas corporation, which entered into a lease with Diamond Point regarding the use of a portion of the Diamond Point Plaza shopping center.

(10) Sam's East, an Arkansas corporation, which allegedly operated the Sam's Club store at Diamond Point Plaza shopping center under a State retail trader's license and later operated the Sam's Club store at Golden Ring Mall.

For convenience, we have loosely grouped the first seven defendants as the Konover defendants, and the final three as the Wal–Mart defendants. We do not mean, by so grouping them, to suggest that all of them committed the particular acts ascribed to the group.

2. It is not clear to us why the court selected April 5, 2005 as the cut-off for pre-judgment interest, but, as no one is complaining about that ruling, we shall not concern ourselves with it.

obligations. Those judgments would be credited with any proceeds that might be recovered in any foreclosure sale of the shopping center property.

(2) With respect to Wells Fargo's claim for the misapplication of rents collected from Diamond Point Plaza tenants, the court entered three judgments against Konover defendants: one in the amount of $633,000 jointly and severally against Diamond Point, Oriole, DPMC, and KMC, together with pre-judgment interest in the amount of $104,466; a second, also for $633,000, against Michael Konover personally; and a third against American Way for $243,500 plus $40,190 in pre-judgment interest.

(3) With respect to the violation of lease restrictions by Sam's Club and Wal–Mart, the court entered two judgments in favor of Wells Fargo against the Wal–Mart defendants, one for $56,260, and one for $1,250,000. The judgment for $56,260 was based on the violation of a radius restriction in the Sam's Club lease occasioned by the opening of a Sam's Club store in Port Covington. The judgment for $1,250,000 was for violation of a different restriction in the Sam's Club lease, limiting the use of the store to retail sales. In an earlier partial summary judgment in favor of Wal–Mart, the court had held that the opening of another Sam's Club store in Golden Ring Mall did not constitute a violation of the radius restriction. Those judgments have been paid and are not at issue in this appeal.

The court denied attorneys' fees sought by Wells Fargo against the various defendants.

In cross-appeals, the Court of Special Appeals affirmed the judgments against the Konover defendants but, after concluding that the radius restriction in the Sam's Club lease was ambiguous, vacated the judgment against the Wal–Mart defendants and remanded for further proceedings, both as to liability for violation of that restriction based on the opening of a Sam's Club store at Golden Ring Mall and for the assessment of attorneys' fees. *Wells Fargo v. Diamond Point,* 171 Md.App. 70, 908 A.2d 684 (2006). We granted cross-petitions

for *certiorari* to consider the following four issues, which, for simplicity, we have restated to some extent:

(1) Whether the Circuit Court erred in finding personal liability on the part of the Konover defendants for losses sustained by Wells Fargo on the mortgage loan. That hinges, to a large extent, on whether the court erred in finding that those defendants had committed intentional misrepresentation or gross negligence in failing to disclose to the mortgage lender that Sam's Club intended to vacate its store in the shopping center and whether that failure to disclose was a proximate cause of the loss.

(2) Whether the Circuit Court erred in concluding, through a partial summary judgment, that the radius restriction in the Sam's Club lease was unambiguous and finding that the opening of a Sam's Club store in Golden Ring Mall on August 1, 2002, did not constitute a violation of that restriction.

(3) Whether the Circuit Court erred in finding liability for the diversion of $633,000 in rents that had allegedly been collected from tenants before Diamond Point's default in November, 2002.

(4) Whether the Circuit Court erred in declining to award attorneys' fees to Wells Fargo.

We shall affirm the judgment of the intermediate appellate court with respect to the Diamond Point and Konover defendants but vacate in part that court's judgment with respect to the Wal–Mart defendants. We disagree with the conclusion of the Court of Special Appeals that the radius restriction in the Sam's Club lease was ambiguous. We agree, however, that the case must be remanded for reconsideration of attorneys' fees.

## I. *BACKGROUND*

The Diamond Point Plaza shopping center was developed in 1988. It was owned by Diamond Point and, until November 26, 2002, was managed by KMC. The shopping center consists of three buildings comprising just over 251,000 square feet.

The largest building, containing nearly 142,000 square feet, was originally leased to Makro, Inc. and used as a Pace Membership Warehouse store. In 1994, Wal–Mart acquired the Pace Membership Warehouse chain of stores, and, pursuant to that acquisition, Makro's interest in the Diamond Point Plaza lease was assigned to Sam's PW, a Wal–Mart affiliate, for use as a Sam's Club. The 20–year lease ran through January, 2009, subject to the tenant's option to extend. For convenience, we shall refer to that lease as the Sam's Club lease. The second building, containing about 78,000 square feet, was leased to Ames Department Stores. That lease was also for 20 years and was to run through April, 2009. Sam's Club and Ames were the anchors for the shopping center. The third building, comprising about 32,000 square feet, was for smaller storefront tenants, each of whom leased less than 5,000 square feet.

Article 8(A) of the Makro/Sam's Club lease required the tenant to continuously operate the demised premises as a Makro store for a period of one year from the date of opening. It then provided that "[t]hereafter, Tenant shall not be required to operate any business within the demised premises, but if Tenant is open for business the demised premises shall only be used for lawful retail and shopping center purposes. . . ."

Article 4 of the lease dealt with the annual rent due under the lease. It provided for a fixed base rent per square foot of chargeable floor area and for an additional rent equal to 0.75% of annual gross sales in excess of $75 million from the demised premises. Two provisions in Article 4 are especially pertinent. Section (G) provided that, subject to other provisions of the lease, Sam's Club had the right "to determine how any store on the demised premises is to be operated, and to discontinue the operation of any such store, and to operate stores in other locations which are in competition with any such store." It is uncontested that, even if Sam's Club opted to discontinue the operation of its store in accordance with Articles 4 or 8, it would still be liable for the base rent through the term of the lease. Section (H) provided, in relevant part, that the tenant

"shall not, during the term of this lease, own, operate, manage or have any financial interest in, any store or business located within a radius of seven (7) miles from the Shopping Center and similar to that then being conducted upon the demised premises."

Construction of the shopping center was financed with a construction loan that was replaced, in 1990, by a 10–year loan in the amount of $16.25 million. At maturity, on January 1, 2000, a balloon payment of $15.3 million was due. Efforts to refinance the loan began in July, 1999. In connection with those efforts, Diamond Point learned that Sam's Club intended to vacate the leased premises. When apprised of that fact, at least two possible lenders, including the then-current one, declined refinancing. On or about January 20, 2000, Diamond Point signed a loan commitment with Pinnacle Capital Group, L.P.

There is a dispute whether, in the course of negotiations with Pinnacle, a Pinnacle employee was advised that Sam's Club intended to vacate the shopping center. The Circuit Court, on the disputed evidence, found as a fact that Pinnacle was not so notified. That goes to the first issue identified above. It is not disputed that the $15.3 million refinancing agreed to by Pinnacle was to be through a conduit loan—that is, although Pinnacle was to be designated as the lender on the loan documents, it would immediately assign the loan to Paine Webber Real Estate Securities, Inc. (PaineWebber), which would provide the funding to close the loan. It is not disputed that Diamond Point and the Konover defendants were aware of that arrangement.

The loan closed on June 2, 2000, and was immediately assigned to PaineWebber. In August, 2000, the loan was packaged together with other loans and assigned to Wells Fargo, as trustee for the Registered Holders of Salomon Brothers Mortgage Securities VII, Inc. The Circuit Court found that neither PaineWebber nor Wells Fargo was ever advised, at or before the time the loan was made or at or

before the time the loan was assigned to it, that Sam's Club intended to vacate the premises.

Among the loan documents executed in connection with the refinancing were a promissory note, an amended and restated mortgage, an assignment of leases and rents, a guaranty, and two borrower's certificates. Both the note and the amended mortgage made clear that, subject to certain exceptions, the loan was to be a non-recourse loan; *i.e.*, the holder would look only to the security of the mortgaged property for collection of the debt. The payee/mortgagee agreed that it would not attempt to enforce liability under the note or mortgage by seeking a money judgment against the maker/mortgagor or any general partner of the maker/mortgagor, including a deficiency judgment in any foreclosure action. Those provisions expressly stated, however, that they did not impair the assignment of leases and rents executed in connection with the loan or

"constitute a waiver of the right of [Payee] [Mortgagee] to enforce the liability and obligation of [Maker] [Mortgagor], by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by [Payee] [Mortgagee] (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(A) fraud or intentional misrepresentation by [Maker] [Mortgagor] or any Guarantor in connection with the Loan;

\* \* \* \*

(F) the misapplication or conversion by Mortgagor of . . . any Rents following an Event of Default; [or]

\* \* \* \*

(I) Failure to maintain its status as a single purpose entity."

This provision is referred to by the parties as a "carve out" exception to the non-recourse status of the loan. The Circuit Court found—and this does not seem to be in dispute—that, to

the extent that there is any personal liability under the carve out exception on the part of Diamond Point, that liability would extend to certain of the other defendants as well— Oriole, as the general partner of Diamond Point; DPMC, the general partner of Oriole; KMC, which guaranteed the non-recourse carve outs; and all but three of the other Konover defendants.

Wells Fargo asserted personal liability against Diamond Point and these defendants under all three of the cited carve out exceptions—fraud or intentional misrepresentation, misapplication of rents, and failure by Diamond Point to maintain its status as a single purpose entity. The claim of fraud or intentional misrepresentation concerned the planned departure of Sam's Club and arose from two certificates issued by Diamond Point, Oriole, and DPMC in connection with the refinancing. On May 31, 2000—two days before the loan closed—those entities issued a Certificate of Borrower in which, "[i]n addition to all other representations, warranties and covenants" made by them in connection with the mortgage loan by Pinnacle, they "represent[ed], warrant[ed] and cove-nant[ed] to Pinnacle and 'its successors, transferees and as-signs,' " that, among other things:

(1) "[W]ith respect to any commercial tenant of the Mort-gaged Property, Borrower has no knowledge of any tenant's intention or notice to vacate the premises and/or cease the payment of rent thereon."

(2) "Borrower knows of nothing involving the Loan [or] the Mortgaged Property ... that may reasonably be expected to (a) cause private institutional investors to regard the Loan as an unacceptable investment; (b) cause the Loan to become delinquent; or (c) adversely affect the Loan's value or market-ability."

(3) "All information set forth in the application for the Loan ... and in all financial statements, certificates and other documents submitted in connection with the Loan Application or in satisfaction of the terms of the Loan Commitment ... is accurate, complete and correct in all material respects. There

has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete, incorrect, or otherwise misleading."

(4) "Each and every representation and warranty contained herein and which is within the Borrower's reasonable control, will remain materially true and correct at all times from the date hereof until the Loan is repaid in full in accordance with its terms."

(5) The Certificate "is delivered to Lender in order to induce Lender to make the Loan. Borrower hereby acknowledges that Lender shall rely upon this Certificate and the making of such representations, warranties and covenants."

Two days later, at closing, the three entities issued a Borrower's Certificate and Consent, in which, among other things, they certified that the representations they had made in the May 31 Certificate remained "accurate and complete" on June 2, 2000.

As noted, the Sam's Club operation at Diamond Point Plaza arose from Wal–Mart's purchase of the Pace stores in 1994. As early as July, 1998, Wal–Mart approved the relocation of that operation and began looking for alternative sites. In January, 2000, Wal–Mart commenced discussions with the developers of the Golden Ring Mall for a Sam's Club. In August, 2000, Wal–Mart gave final approval to the relocation of the Sam's Club store at Diamond Point Plaza to Golden Ring. Wal–Mart purchased the property for the store and began construction. This was not to be an additional site for a Sam's Club store, but a relocation of the Diamond Point Plaza store. On July 31, 2002, Sam's Club vacated the Diamond Point Plaza store and the next day, August 1, 2002, opened the new store at Golden Ring Mall. The Golden Ring Mall store is about two-and-a-half miles from the Diamond Point Plaza shopping center and thus well within the seven mile radius specified in Article 4(H) of the Sam's Club lease. The action by Wells Fargo against the Wal–Mart defendants is based, in part, on the complaint that the Golden Ring store constitutes a violation of the radius restriction. The Circuit Court, in

entering a partial summary judgment for Wal–Mart, found that the Golden Ring Mall operation did not constitute a violation because the two stores were never in simultaneous operation. That is the second major issue in this appeal.

In addition to the Golden Ring Mall store, Wal–Mart opened a Sam's Club store in Port Covington, which lies 6.875 miles from the Diamond Point Plaza center—just barely within the seven-mile radius. That store opened in May, 2002, and was thus in simultaneous operation with the store in Diamond Point Plaza for three months. The Circuit Court found that the Port Covington Store constituted a violation of the radius restriction and awarded $56,260 in damages for that violation. That finding is not contested in this appeal.

The second anchor in the Diamond Point Plaza shopping center was an Ames Department Store. On August 20, 2001, Ames filed for Federal bankruptcy protection, in the course of which it decided to close its stores and liquidate its holdings. In late October, 2002, Ames rejected its lease with Diamond Point and ceased paying rent. When informed of that fact, Michael Konover, on behalf of Diamond Point, made the business decision to let the mortgage loan go into default, and so the monthly mortgage installment due November 1, 2002, was not paid. On November 22, 2002, Wells Fargo formally advised Diamond Point that the loan was in default, declared the entire amount of the loan immediately due and payable, revoked Diamond Point's license to collect rents, and instructed it to turn over all rents in its possession. On November 26, a receiver was appointed for the property.

In Article 7 of the restated mortgage and in a separate Assignment of Leases and Rents, executed in connection with the 2000 refinancing, Diamond Point unconditionally assigned to Pinnacle and any subsequent holder of the mortgage its right, title, and interest in all current and future leases and rents from the mortgaged property. Pinnacle, in turn, granted to Diamond Point a revocable license to manage the property and collect the rents, but the mortgage and Assignment declared that Diamond Point would hold the rents, or

portion thereof sufficient to discharge all current sums due on the debt, in trust for the benefit of the mortgagee. The mortgage provision continued:

"Upon an Event of Default, the license granted to Mortgagor herein shall be automatically revoked and Mortgagee shall immediately be entitled to possession of all Rents, whether or not Mortgagee enters upon or takes control of the Mortgaged Property."

That statement, in nearly identical language, appeared as well in the Assignment of Leases and Rents.

Under both the promissory note and Article 20(a) of the restated mortgage, an "Event of Default" was defined to occur if any payment required by the Note was not paid on or before the fifth day after the date when it was due. The failure to make the November, 2002 payment by November 5 therefore constituted an Event of Default, and, accordingly, on November 6, 2002, Diamond Point's license to collect and retain rents from the shopping center tenants was terminated.

On November 22, 2002, Diamond Point transferred $633,000 in rents that it had previously collected to "MCK." It was disputed whether those funds were transferred to MCK, Inc. or to Michael C. Konover personally. Wells Fargo sought to recover those funds, from Diamond Point, Oriole, DPMC, Konover, MCK, Inc., and American Way. The Circuit Court determined that (1) the transfer, made after an Event of Default, was a misapplication and a fraudulent transfer that triggered liability under the carve out provisions of the Note and Mortgage on two alternative grounds, (2) that the transfer rendered Diamond Point insolvent, and (3) that the transfer was made to, or directly benefited, Michael Konover personally. The Circuit Court entered judgment against all of those defendants, except American Way, for the $633,000, plus pre-judgment interest, and it entered judgment against American Way for $243,500—the portion of the $633,000 that the court found American Way had received, plus pre-judgment interest.

With this background, we turn to the issues raised in the *certiorari* petitions, adding such additional facts as are required to address those issues.[3]

## II. *DISCUSSION*

### A. *Personal Liability for Losses on the Loan*

It is undisputed that the refinancing loan made by Pinnacle and assigned ultimately to Wells Fargo was a non-recourse loan under which the holder agreed to look only to the mortgaged property in the event of a default on the loan and not to pursue any personal liability against Diamond Point, any general partner of Diamond Point, or any guarantor of the loan. Wells Fargo's claim against those entities for losses allegedly sustained upon Diamond Point's default was based on the carve out exception to the non-recourse provision; i.e., by failing to disclose that Sam's Club intended to vacate its

---

**3.** There was one other significant claim made by Wells Fargo, which hinged on the caveat in Article 8 of the Sam's Club lease requiring that, if the tenant remained open for business, the demised premises could only be used for "lawful retail and shopping center purposes." In October, 2002, shortly after Sam's Club vacated the Diamond Point Plaza premises, Wal–Mart entered into a "license," which seemed to be more in the nature of a sublease, with The Wire Productions, Inc., under which the licensee was permitted to use the Sam's Club space as a studio for making the HBO television series, The Wire. Wal–Mart did not give notice to or obtain the consent of Diamond Point for any assignment of the lease to the licensee.

The license was for a one-year term with an option by the licensee for two one-year extensions. The licensee exercised one option and, since October, 2004, remained a month-to-month tenant. Under the license, Wal–Mart collected $53,157 per month in rent which, as of May, 2005, amounted to over $1.6 million. The Circuit Court concluded that, through its conduct, Wal–Mart had assumed the obligations of the tenant under the Sam's Club lease and was therefore liable for a violation of the prohibition against using the property for any purpose other than retail sales. The basis for the damage claim was the inability to profitably rent the Ames space while the Sam's Club space was being used for a non-retail purpose. Based on evidence presented primarily by Wal–Mart, the Circuit Court calculated the damages from the breach to be $1,250,000, and entered judgment against Wal–Mart in that amount. As noted, that judgment has been paid and is no longer contested.

store—indeed, by certifying the contrary—Diamond Point committed fraud or made an intentional misrepresentation.

The Konover defendants, against whom personal liability was asserted, defended on the ground that Wells Fargo had failed to prove that Diamond Point's omission to disclose Sam's Club's intention to vacate in its borrower's certificates was the proximate cause of any loss suffered by Wells Fargo. That argument has three prongs: (1) that it was not Sam's Club's departure that caused the default on the loan but rather the departure and rejection of the lease by Ames; (2) that there was no evidence that Wells Fargo ever reviewed the borrower's certificates and therefore relied on them; and (3) that Pinnacle knew about Sam's Club's intention to close its store before it made the loan.

Adjunctively to this third prong, the defendants urge that, because Sam's Club's intention had been disclosed to Pinnacle, the borrower's certificates were not really inaccurate. The May 31, 2000 certificate, they note, is prefaced with the phrase that the representations in the certificate are "[i]n addition to all other representations, warranties and covenants" made by Diamond Point. They thus argue that, as Pinnacle had already been told about Sam's Club's intention to vacate, the representation that Diamond Point had "no knowledge of any tenant's intention or notice to vacate the premises," being merely cumulative, was not inaccurate. We shall consider these prongs in inverse order.

### Pinnacle's Knowledge Regarding Sam's Club's Intention To Vacate

▮ Because it is undisputed that Diamond Point was aware, before it ever began negotiations with Pinnacle, that Sam's Club was making plans to vacate its store at Diamond Point Plaza, we need not recount the abundant evidence in the record establishing that fact. There is also ample evidence, credited by the Circuit Court, that Sam's Club's planned departure was a material fact that would be of interest to any potential lender. Before soliciting Pinnacle, Diamond Point contacted a number of brokers and lenders, including Princi-

pal Mutual Life Insurance Co., which held the then-current loan, Lehman Brothers Holdings, Inc., and an entity identified only as Finova, none of which were willing to extend a loan after they learned of Sam's Club's intention.

Heading up the effort to obtain refinancing of the Diamond Point loan were Susan Larkin and Richard Liljedahl, who worked for a Konover affiliate known as Konover Capital Advisers. Both of them were aware of Sam's Club's intention to vacate before negotiations commenced with Pinnacle. Indeed, they first learned that information from Lehman Brothers, who obtained it from Wal–Mart's web site. It is undisputed that that information was never communicated to PaineWebber or Wells Fargo. The dispute is whether it was ever communicated to Pinnacle.

Susan Larkin testified at trial that, at a very early stage in her conversations with Pinnacle—even before an application for a loan was submitted—she informed one Chick (Charles) Chamberlin, a Pinnacle vice-president, that Sam's Club was looking for another location. She could not remember exactly what she told Chamberlin but said that, in general, she advised him that Sam's Club was looking for another location, that it had not yet identified one, and that it was continuing to operate the store and pay the rent. Supplementing that testimony was an undated draft e-mail from Chamberlin to his supervisor, Patrick Morris, found on Chamberlin's home computer, regarding the Diamond Point Plaza matter. In that document, Chamberlin stated that, "[a]s I mentioned to you, the Applicant has informed me that Sam's Club, in spite of strong sales, has indicated a desire to find another location within the market, apparently because they did not originally select this site, but rather acquired it in an acquisition of former Pace stores from K–Mart." That evidence, according to the defendants, constitutes the smoking gun that establishes that Pinnacle *was* told about Sam's Club's intentions.

In deposition testimony, Chamberlin identified the draft e-mail as one he "believes" he sent to Morris but did not know when it might have been sent. Morris, however, testified that

he did not recall receiving that e-mail and that he had no specific recollection of ever discussing Sam's Club's intentions with PaineWebber.

In resolving this issue, the Circuit Court made express credibility decisions. It found that Larkin and certain other Konover witnesses were "motivated to tell a story in a way that makes their version of the events unreliable" and that, "[t]o the extent that the testimony of these witnesses conflicts with the testimony of other witnesses, the conflicting testimony of these witnesses is rejected." The court noted that, in one or more communications sent by Larkin to Pinnacle, no mention was made of Sam's Club's intention, notwithstanding that, when those communications were sent, she was aware of its intended move and understood the importance of that information to any prospective lender. The court expressly concluded that (1) "the information was not provided to Charles 'Chick' Chamberlin prior to the loan closing," (2) "PaineWebber, the party that ultimately funded the Loan, was never made aware of Sam's intention to vacate Diamond Point early, even though both Richard Liljedahl and Susan Larkin knew that PaineWebber would become the assignee of the Loan and Loan Documents at closing," and (3) "[t]he evidence clearly established that none of the decisionmakers at Pinnacle and no one at PaineWebber was told the material information described above and which was contrary to the written representation of Diamond Point." Those findings, in turn, led the court to determine that Wells Fargo had met its burden of proving, by clear and convincing evidence, that the relevant representations in the Borrower's Certificate and Consent "were fraudulent."

The Circuit Court, which heard the testimony of Ms. Larkin and had before it Mr. Morris's testimony that he did not recall ever receiving Chamberlin's alleged e-mail, had every right to make that credibility decision and to make the ultimate finding that neither Pinnacle nor PaineWebber was told about Sam's Club's intent to vacate prior to the closing of the loan. In light of that finding, which we find not to be clearly erroneous, we need not address the question of whether disclosure of the

information during negotiations rendered the borrower's certificate that it "has no knowledge of any tenant's intention or notice to vacate the premises" not inaccurate. It clearly was inaccurate—knowingly and fraudulently inaccurate.

*Reliance by PaineWebber and Wells Fargo*

■ The Konover defendants contend that "no one associated with Wells Fargo ever reviewed or considered the Certificate of Borrower" before purchasing the package of loans and that the borrower's certificates "was not even part of the due diligence that PaineWebber made available for Wells Fargo's investors to review in determining whether to participate in the deal." On that premise, they argue that Diamond Point's representations "could not possibly have affected the value that Wells Fargo ascribed to the Diamond Point loan or otherwise caused Wells Fargo any harm in these circumstances."

We note initially that the defendants' statement that the borrower's certificates were not part of the due diligence that PaineWebber made available to Wells Fargo may be a stretch of the actual evidence. The source of that statement is the deposition testimony of Douglas Goldrick, who worked for ORIX Capital Markets, the servicing agent which administered the loan on behalf of Wells Fargo. Mr. Goldrick did not say that the borrower's certificates were not part of the due diligence done by PaineWebber. He simply stated that he did not see those certificates in a due diligence file prepared for ORIX.

That aside, the Certificate of Borrower itself stated that (1) it was being delivered to the Lender "to induce Lender to make the loan," (2) Diamond Point acknowledged "that Lender shall rely upon this Certificate and the making of such representations, warranties and covenants," (3) "[e]ach and every representation and warranty contained herein and which is within the Borrower's reasonable control, will remain materially true and correct at all times from the date hereof until the Loan is repaid in full in accordance with its terms," and (4) if any representation "becomes untrue, in whole or in part,

after the date hereof, Borrower will so advise Lender in writing immediately." The representations in the Certificate were made to the Lender (Pinnacle) and "its successors, transferees, and assigns," and therefore ran as well to Paine-Webber. The Circuit Court thus properly concluded that Diamond Point "had a continuing duty ... to notify Pinnacle and/or PaineWebber if any representation or warranty became untrue." There is no evidence that Diamond Point gave any notice to Pinnacle or PaineWebber regarding Sam's Club after the loan closing.

The Konover defendants clearly understood that Paine-Webber would likely sell the mortgage, separately or as part of a larger package. From essentially undisputed evidence, the Circuit Court found that those defendants were "sophisticated in the business of commercial loans generally and conduit loans in particular, including the fact that conduit loans like the one being pursued in 2000, would be sold to institutional investors in a secondary market transaction." More particularly, in Paragraph 53 of the restated mortgage, Diamond Point expressly acknowledged that Pinnacle "and its successors and assigns" may, among other things, "deposit, through one or a series of transactions, this Mortgage, the Note and Other Security Documents with a trust, which trust may sell certificates to investors," and it agreed to cooperate with the mortgagee in "effecting any such Secondary Mortgage Transaction." It is certainly implicit that Diamond Point had more than good reason to expect that any secondary buyer, including a trustee in the position of Wells Fargo, would necessarily receive and rely on the loan documents, including the representations of material fact made in its borrower's certificates.

Although Wells Fargo's claims for losses on the mortgage loan were breach of contract, rather than tort, actions, they were founded on an allegation of fraud or intentional misrepresentation, and, as a result, the principles set forth in §§ 531 through 533 of the Restatement (Second) of Torts are instructive. Section 531 states, as a general rule:

"One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced."

Section 532, dealing more particularly with misrepresentations made in commercial documents, adds:

"One who embodies a fraudulent misrepresentation in an article of commerce, a muniment of title, a negotiable instrument or a similar commercial document, is subject to liability for pecuniary loss caused to another who deals with him *or with a third person* regarding the article or document in justifiable reliance upon the truth of the representation." (Emphasis added).

Comment b. to § 532 characterizes the section as "saying that the maker of a fraudulent misrepresentation incorporated in a document has reason to expect that it will reach and influence any person whom the document reaches." Consistently with that view, § 533 provides:

"The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved."

Under these principles, Diamond Point would be liable to Wells Fargo. It made a fraudulent misrepresentation in a commercial document, for the purpose of inducing Pinnacle and PaineWebber to extend a loan, aware that PaineWebber likely would sell that loan in the secondary market. Diamond Point would thus have reason to expect that the loan documents, including its borrower's certificates, would be presented to, would be considered by, and would influence the deci-

sion of prospective buyers in the secondary market. The mere fact that those certificates could not be immediately located in one due diligence file does not mean that they were not presented to, considered by, and influenced Wells Fargo in determining whether to purchase the Diamond Point mortgage. Liability is not defeated by the fact that Diamond Point's representations were not made directly to Wells Fargo. *See Sempione v. Provident Bank of Maryland*, 75 F.3d 951, 962–63 (4th Cir.1996); *Superior Bank, F.S.B. v. Tandem Nat'l. Mortg., Inc.*, 197 F.Supp.2d 298 (D.Md.2000); *Ernst & Young v. Pacific Mutual Life Insurance Co.*, 51 S.W.3d 573 (Tex.2001); *Reisman v. KPMG Peat Marwick*, 57 Mass.App. Ct. 100, 787 N.E.2d 1060 (2003); *compare Walpert v. Katz*, 361 Md. 645, 762 A.2d 582 (2000), an action founded solely in negligence.

### Proximate Cause

■ The major defense mounted to Wells Fargo's claim for losses sustained on the loan is that the representations made in the borrower's certificates were not the proximate cause of those losses. The losses sustained by Wells Fargo, they urge, arose from Diamond Point's default on the loan, and that was due entirely to the loss of income arising from Ames's rejection of its lease, which occurred more than two years after the loan closed. No loss, they claim, arose from the departure of Sam's Club, as Wal–Mart continued to pay the rent for that space. They complain that the Court of Special Appeals "erroneously reasoned that a proximate cause analysis applies only in a tort action" and "[e]schewing the required proximate cause analysis," found liability solely on the basis of the carve out provision.

As a preface, defendants have completely misread what the Court of Special Appeals said and held. That court did not "eschew" a proximate cause analysis when considering liability under the carve out provision. The discussion they point to concerned liability for damages arising from Wal–Mart's licensing of the space to The Wire Productions, Inc., not the carve out provision or the representations made in the borrow-

er's certificate. *See Wells Fargo v. Diamond Point, supra,* 171 Md.App. at 112–13, 908 A.2d at 709. Affirmance of the judgment arising from Diamond Point's fraud was based on the conclusion that "[h]ad Pinnacle and/or PaineWebber known or been apprised of Sam's planned departure from the Center, it is unlikely that Diamond Point *[sic,* Pinnacle or PaineWebber] would have approved the loan." *Id,* at 125, 908 A.2d at 716.

That is clearly a proximate cause analysis, and one that has merit. Based on the actual experience of the Konover defendants in their dealings with Lehman Brothers, Principal Mutual, and Finova, it is a fair inference that, had Pinnacle or PaineWebber been informed of Sam's Club's intended departure prior to June, 2000, and not, in fact, been misled by the false statement that Diamond Point had no knowledge of any tenant's intention to vacate, the loan would not have been made, or at least not on the same terms.[4] As noted, the Circuit Court found as a fact that Pinnacle and PaineWebber "relied on the Certificate of Borrower and the Borrower's Certificate and Consent in closing the Loan." That, alone, would have avoided or ameliorated any loss by Wells Fargo. It is an equally fair inference that, had PaineWebber been informed of Sam's Club's intended departure at any time between June and August, 2000, and communicated that information to Wells Fargo, as it would have been obliged to do, Wells Fargo would not have purchased that loan.

The record does, indeed, indicate that the calculated business decision by Konover to allow the loan to go into default was prompted by Ames's rejection of its lease and the loss of income from that lease, and that default triggered enforcement action. That is not the end of the story, however. For one thing, there was substantial evidence showing that the loss

---

**4.** It would not be idle speculation to suppose that, even if Pinnacle/PaineWebber would have been inclined to make the loan in light of knowledge that the major anchor, occupying more than half of the shopping center, would be leaving, they might have been reluctant to make the loan a non-recourse one, looking only to the mortgaged property as security.

of rental income from Ames did not render Diamond Point unable to make payments on the mortgage and thus did not necessarily engender a default. The Ames base rent was under $40,000 per month; that was the extent of the income stream that would be interrupted until such time as the Ames space could be re-rented. Immediately prior to the Ames pullout, the shopping center was more than 95% rent-productive, and Diamond Point had $633,000 in its accounts. Mr. Konover made a business decision to have Diamond Point default on the mortgage, obviously believing it to be a non-recourse loan that would engender no liability to himself or any of his companies, but the court made no finding that the loss of rent from Ames necessitated a default on the mortgage and the evidence did not compel any such finding.

To a large extent, that is all beside the point in any event. The loss occasioned by Wells Fargo, once it made the decision to purchase the loan, was not due to the loss of rent from Ames. In February, 2000, while considering whether to extend a loan, Pinnacle had the shopping center property appraised. The appraisal showed a market value of $20 million, which Pinnacle obviously and reasonably believed would be adequate security for a $15.3 million loan. That appraisal took significant account of the Sam's Club lease. It estimated a potential net cash flow from that lease of approximately $1.4 million per year, through March, 2011 (compared with about $600,000 from the Ames lease).

In September, 2002, immediately following the departure of Sam's Club, ORIX requested and received another appraisal, which was in three parts. The shopping center, as a whole, was appraised first in an "as is" condition at $7,350,000, based on the assumptions that the Sam's Club lease had been "bought out" (which had not occurred but was then planned) and that the Ames lease had been dissolved. That represented a 60% decline in the value of the center. The center was also appraised in an "as stabilized" condition, *i.e.*, "as of a point in time when all improvements have been physically constructed and the property has been leased to its optimum level of long term occupancy," at $14.3 million. The appraisal

thus showed a decline, even in a "as stabilized" condition, of $5.7 million, or 28.5%, between February, 2000 and September, 2002. The Sam's Club space was appraised separately, on the assumption that it could be subdivided from the shopping center and sold separately, at $4.2 million.

In July, 2004, the 2002 appraisal was updated. The shopping center was appraised at that time at $10.3 million, a decline of nearly 50% since 2000 and still $4 million less than the "as stabilized" estimate from 2002. The total mortgage debt as of April, 2005, including taxes, interest, insurance, and other fees and expenses, was over $26 million, subject to credits of about $3.7 million, for a net amount due of $22.8 million. The outstanding principal at the time was just over $15 million. Apart from the fact that no percentage rent would be forthcoming from Sam's Club, the appraiser noted that the loss of control over that space hindered a unified redevelopment and marketing plan.

The nexus between Diamond Point's false certificate and Wells Fargo's loss is a dual one. First, had Diamond Point disclosed what it knew, it is likely that the loan would not have been made in the first place, at least on the same terms. Second, having purchased the loan in ignorance of Sam's Club's intended departure, Wells Fargo was faced, upon Diamond Point's default, with a 60% drop in the value of the center, which, in light of the non-recourse provisions, was the sole security for the loan. It had a $15 million loan secured by property that, when it purchased the loan was worth $20 million but, upon default, was currently worth only $7.3 million. There was sufficient evidence to show that Wells Fargo's loss was proximately caused by Diamond Point's false certificate.

### Diversion Of Rents ($633,000)

■ The failure of Diamond Point to make its November, 2002 mortgage payment by November 5 constituted, effective November 6, an Event of Default under the restated mortgage. On November 22, 2002—the very day that Wells Fargo accelerated the loan—Diamond Point transferred $633,000 to

"MCK," indicating on its ledger that the transfer was an "advance." Wells Fargo claimed that the transfer constituted a misappropriation of rents and a fraudulent transfer, for which the Konover defendants were personally liable. The Circuit Court found that to be the case. Those defendants complain that the contractual provisions relating to the assignment of rents do not apply to rents collected prior to an Event of Default, that no evidence was presented that any part of the $633,000 constituted rents collected after November 6, and that the Circuit Court erred in finding that the $633,000 went to Konover personally.

As noted, under Article 7 of the restated mortgage, Diamond Point unconditionally assigned to the mortgagee its right, title, and interest "in all current and future Leases and Rents, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only." Article 7 contained a revocable license for Diamond Point to collect the rents and to hold them in trust for the Mortgagee but expressly provided that "[u]pon an Event of Default, the license granted to Mortgagor herein shall be *automatically* revoked and Mortgagee shall *immediately* be entitled to possession of all Rents" and that "[a]ny Rents collected after the revocation of the license herein granted may be applied toward payment of the Debt in such priority and proportion as Mortgagee in its discretion shall deem proper." (Emphasis added). Similar provisions, in virtually identical language, appear in the contemporaneously executed Assignment of Leases and Rents. The Assignment includes within the definition of "Rents" all "accounts, deposits, rents, income, issues, revenues, receipts, insurance proceeds, and profits arising from the Leases."

The carve out provision in Article 55 of the restated mortgage excepts from the non-recourse nature of the loan, in addition to fraud and intentional misrepresentation "the misapplication or conversion by Mortgagor of . . . Rents following an Event of Default" and the "[f]ailure [of Mortgagor] to maintain its status as a single purpose entity."

Article 56 of the restated mortgage deals more specifically with the single purpose entity requirement. Among other things, it prohibits the Mortgagor from (1) commingling its assets with the assets of any general partner, affiliate, principal, or other person, (2) entering into any agreement with such a person except on terms that are intrinsically fair and substantially similar to those that would be available on an arms length basis with third parties other than such persons, and (3) making any loan to any third party.

The Circuit Court found that the $633,000 transferred by Diamond Point constituted "rent," that the transfer, made after an Event of Default, was therefore in violation of Article 7 of the restated mortgage and the Assignment of Leases and Rents, and that, under Article 55 of the restated mortgage, such a transfer constituted an exception to the non-recourse provision. Alternatively, the court determined that, as the transfer was regarded by Diamond Point as an "advance" to MCK, it constituted a prohibited loan to a third party, and, as there was no accompanying note expressing clear repayment terms, it constituted as well an agreement with a general partner or affiliate on terms that were not intrinsically fair and would not be available on an arms length basis with a third party.

The Diamond Point ledger showed the advance being made to "MCK," and a dispute arose whether that was MCK, Inc. or Michael C. Konover personally. The court concluded that the funds were partially repaid to Diamond Point but that $486,500 of the funds were then distributed to the partners of Diamond Point, $243,500 to Oriole and $243,000 to American Way. The court made two relevant findings in this regard. It concluded first that the transfer actually was made to Konover personally and not to MCK, Inc. In reaching that conclusion, the court expressly declared that the testimony of the principal Konover witness on that point, James Ainsworth, was not credible.[5] Alternatively, the court found that, even if the

---

5. James Ainsworth, a senior officer in a number of Konover entities, testified that, on November 22, 2002—the day that Wells Fargo formally

initial transfer was to MCK, Inc., Konover was the beneficiary of it. At least $487,000 was returned to Diamond Point and then distributed to Oriole and American Way. Because Konover was an 86% owner of Oriole and a 100% owner of American Way, the court declared the entire scheme to be a fraudulent transfer, structured on the books as an advance but in fact a transfer to Konover for the purpose of deceiving creditors, including Wells Fargo.

We have no difficulty affirming the Circuit Court's various and alternative rulings. As noted, the term "rents," for purposes of the Assignment, is broad. It includes all accounts, revenues, receipts, and profits arising from the lease. That would include funds collected at any time from the tenants. The fact that Diamond Point chose to retain funds previously collected from the tenants in its accounts does not withdraw them from the scope of the Assignment. Those funds were held in trust for Wells Fargo, and, immediately upon the Event of Default, Diamond Point's control over them terminated. The "sweep" of those funds on November 22, the effect of which was to leave Diamond Point insolvent, constituted a clear violation of the restated mortgage and Assignment and therefore fell squarely within the exception to the non-recourse provision for "misapplication or conversion by Mortgagor of . . . any Rents following an Event of Default."

---

called a default on the loan—he was directed to "sweep" the Diamond Point accounts, *i.e.*, to withdraw all but a nominal amount. He withdrew $633,000 from Diamond Point—the "retained earnings" of that entity—and transferred the funds, he said, to MCK, Inc., which controlled the financing activities of the Konover entities, and not to Konover personally. That transfer left Diamond Point with only a nominal amount of money, about $1,000, notwithstanding that a mortgage payment in the amount of $122,000 was then in default. For whatever reason, the $633,000 was returned to Diamond Point in dribs and drabs, beginning about three weeks later—$27,000 on December 11, 2002, $11,000 on December 26, $5,000 on January 31, 2003, $80,000 on June 26, and $510,000 on July 10. In July, 2003, $487,000 was distributed equally to the two partners of Diamond Point—$243,500 each to Oriole and American Way. The court's finding that American Way received only $243,000 was apparently an error. Its finding that Ainsworth's testimony was not credible is not in error.

Disbelief of Mr. Ainsworth's testimony allowed the Circuit Court to reject as well the convoluted paper trail of the $633,000 and see the transaction for what it was—the fraudulent transfer of those funds from the reach of the creditors of Diamond Point to Konover. The court was fully justified, as an alternative, in accepting the entry on Diamond Point's ledger that the transfer was an advance, for which there was no repayment obligation, and thus to treat it as an unauthorized loan and unfair transfer, both of which would violate the "single purpose entity" provision of the restated mortgage and independently give rise to personal liability.

### Radius Restriction As Applied To Golden Ring Mall Store

As we have observed, Articles 8(A) and 4(G) of the Sam's Club lease permitted Sam's Club to discontinue the operation of its Diamond Point Plaza store, although if it did so, it would remain liable for the basic rent due under the lease throughout the term of the lease. Subject to other provisions of the lease, including Article 4(H), Article 4(G) also permitted Sam's Club to "operate stores in other locations which are in competition" with its Diamond Point Plaza store. The caveat in Article 4(H) was that Sam's Club "shall not, during the term of this lease, own, operate. manage or have any financial interest in, any store or business located within a radius of seven (7) miles from the Shopping Center and similar to that then being conducted upon the demised premises."

It is undisputed that Wal–Mart began making plans to relocate the Sam's Club Diamond Point store in 1998, that it ultimately approved Golden Ring Mall as the new site, that it began construction of a store there in or about 2000, that it closed the Diamond Point Plaza store on July 31, 2002, that it opened the Golden Ring Mall store the next day, August 1, 2002, and that the Golden Ring Mall store was well within a seven-mile radius from the Diamond Point Plaza shopping center. The question, presented to the Circuit Court in cross-motions for partial summary judgment, is whether the con-

struction and operation of the Golden Ring Mall store constituted a violation of Article 4(H).[6]

Wal–Mart, stressing the language "and similar to that then being conducted upon the demised premises," took the position that there was no violation, because that language limited the restriction to a situation where the Diamond Point Plaza store and the second store were in simultaneous operation, which was never the case here. Wells Fargo, focusing more on the prohibition against owning, operating, or managing another store or business "during the term of this lease," urged that the restriction applied to any such store or business at any time during the term of the Diamond Point Plaza lease, regardless of whether the Diamond Point Plaza store remained in operation.

On January 10, 2005, the court, agreeing with Wal–Mart, granted its motion. The court concluded that the provision was unambiguous and that it required "both stores to be operating simultaneously." It continued that, "unless the doors of both locations were open for business and customers

---

6. Wells Fargo asserted as well, and continues to argue, that, because Wal–Mart had breached the lease by virtue of Sam's Club's Port Covington store, it was precluded from even making the argument that the Golden Ring Mall store did not constitute a breach of the lease. For that proposition, it relies on the precept articulated in *Restatement of Contracts (Second)*, § 237 that, except where performance is agreeably apportioned into acceptable parts, "it is a condition of each party's remaining duties to render performance to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." Wells Fargo interprets this statement to mean that "one who is in material breach of a contract cannot claim one of the contract's benefits to defeat a legitimate claim by the non-breaching party." Wells Fargo acknowledges that this Court has never expressly adopted the *Restatement* language.

Even if we were inclined to do so, however, we would not extend that principle to the facts of this case. It is one thing to preclude a party to a contract from seeking some benefit or affirmative relief under the contract when that party is itself in material breach, which is what the *Restatement* and the few cases cited by Wells Fargo purport to do. It is quite another to preclude a party in breach from defending against a claim of an independent breach. There is no substantial support for *that* proposition, and we are not prepared to adopt it.

were being served simultaneously, then and only then would the radius restriction have been violated." The Court of Special Appeals disagreed with that determination, at least as a matter of law. It held that the language of Article 4(H) was ambiguous, that "a dispute existed as to the material fact as to whether maintenance of a presence at both locations constituted ownership, etc. in any store similar to that being conducted." *Wells Fargo v. Diamond Point, supra,* 171 Md.App. at 102, 908 A.2d at 703. The appellate court added that "Wells Fargo, in our view, presented sufficient facts to demonstrate ambiguity as to whether a breach only occurred if there were competing businesses at the two locations." *Id.*

■■■ We have stated the relevant rules of contract interpretation many times. Just recently, in *United Services v. Riley,* 393 Md. 55, 79, 899 A.2d 819, 833 (2006), we confirmed that "[c]ontract interpretation, including the determination of the ambiguity of a contract, is a question of law and subject to *de novo* review." A contract is ambiguous if, "when read by a reasonably prudent person, it is susceptible of more than one meaning." *Id.* at 80, 899 A.2d at 833, quoting *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358, 363 (1999). A contract is not ambiguous simply because, in litigation, the parties offer different meanings to the language. It is for the court, supposing itself to be that reasonably prudent person, to determine whether the language is susceptible of more than one meaning.

■■■ Determining whether contractual language is susceptible of more than one meaning "requires an examination of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'" *United Services v. Riley, supra,* 393 Md. at 80, 899 A.2d at 833, quoting *Calomiris,* 353 Md. at 436, 727 A.2d at 363. If, to the court, the language is unambiguous, the court must "give effect to its plain meaning and [ ] not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran v. Norkunas,* 398 Md. 1, 16, 919 A.2d 700, 709 (2007). In construing contractual language,

including for the purpose of determining whether ambiguity exists, "effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Cochran,* 398 Md. at 17, 919 A.2d at 710, quoting *Sagner v. Glenangus Farms,* 234 Md. 156, 167, 198 A.2d 277, 283 (1964).

Applying these precepts, we agree with the conclusion of the Circuit Court that there is no ambiguity in the language of Article 4(H) and that its plain intent and meaning is to prohibit Sam's Club, while operating a store in the leased premises at Diamond Point Plaza, from simultaneously owning, managing, or operating another similar store within seven miles from that shopping center. A reasonably prudent person could reasonably find the language susceptible of the meaning ascribed to it by Wells Fargo only if the ending phrase were not part of it—if it simply prohibited Sam's Club, during the term of the lease, from owning, managing, or having a financial interest in a store or business located within a radius of seven miles from the Diamond Point Plaza shopping center. Then, the prohibition would be broad, clear, and absolute: *any* store or business would be precluded for the entire duration of the lease, regardless of whether a Sam's Club store at Diamond Point Plaza was operational.

That is not what the contract says, however. The prohibition is clearly limited. What is precluded is owning, managing, operating, or having a financial interest in a store or business, during the term of the lease, that is "similar to that *then* being conducted upon the demised premises." (Emphasis added). That necessarily requires that there be a store or business presently being conducted at Diamond Point Plaza and that the second store or business within the seven mile radius be similar to it. For the language to be reasonably susceptible to Wells Fargo's construction, that ending phrase, adding the requirement of similarity between the second store and that "then being conducted upon the demised premises," would have to be virtually ignored, which our jurisprudence

does not allow.[7] The Court of Special Appeals was wrong in declaring Article 4(H) ambiguous and in effectively vacating the partial summary judgment entered by the Circuit Court.

## Attorneys' Fees

Wells Fargo sought attorneys' fees against both the Konover and Wal–Mart defendants. The claim against the Kon-

---

**7.** Because the language is so plain in its meaning, we do not need to search for and weigh extraneous reasons why the construction dictated by that plain meaning was the one more likely intended than that urged by Wells Fargo. We do make several observations, however, that support the view taken by the Circuit Court and by us. First, radius restrictions of the kind set forth in Article 4(H) are in the nature of restrictions on trade and competition, which are to be narrowly construed. *See, in general, American Weekly, Inc. v. Patterson*, 179 Md. 109, 16 A.2d 912 (1940); *Tawney v. Mutual System of Md.*, 186 Md. 508, 47 A.2d 372 (1946); *Snyder's Drug Stores v. Sheehy Properties, Inc.*, 266 N.W.2d 882 (Minn.1978) ("[P]ublic policy dictates that restrictive covenants, being restraints of trade be strictly construed."); *Huddleston v. Mariotti*, 143 W.Va. 419, 102 S.E.2d 527 (1958). Second, the radius restriction was part of Article 4 of the Lease, dealing with annual rent. Section (A) of Article 4 provides for the basic rent for each lease year— $ X per square foot of chargeable floor area. It is a self-contained provision; no other part of Article 4 is necessary to determine the amount of basic rent or how it is to be paid. The rest of Article 4 deals with the additional percentage rent based on annual sales in excess of $75 million. Section (B) provides for that additional rent; § (C) provides for how that rent is to be calculated if the commencement date is other than January 1; § (D) provides for when and where the percentage rent is to be paid; § (E) defines "Gross Sales" for purposes of the percentage rent; § (F) requires Sam's Club to keep a correct account of all business done by it and furnish a statement of its gross volume of business to Diamond Point. Sections (G) and (H), as noted, permit Sam's Club to discontinue operation of the store and to operate stores in other locations, subject to the radius restriction in section (H). Read in context, it would seem clear that the purpose of the radius restriction was to protect the percentage rent by precluding competing operations within the same market area that might siphon sales from the Diamond Point Plaza store. The percentage rent, of course, needs no protection if operation of the Diamond Point Plaza store is properly discontinued. *See Winrock Enters., Inc. v. House of Fabrics of N.M., Inc.*, 91 N.M. 661, 579 P.2d 787 (N.M.1978). To construe the radius restriction as prohibiting any other store or business by Sam's Club within seven miles of the shopping center for the entire term of the lease, even after the operation at Diamond Point has been lawfully discontinued and there is no prospect of any percentage rent would

over defendants was based, in large part, on the carve out provision in Section 55 of the restated mortgage that specifically allowed the recovery of attorneys' fees in the enforcement of liability arising in connection with fraud or intentional misrepresentation or the failure of Diamond Point to maintain its status as a single purpose entity.  The claim against the Wal–Mart defendants was based on Section 20 of the Sam's Club lease, which provided, among other things, for the remedies available to the landlord upon a tenant's default.  That lease, of course, had been assigned to Wells Fargo under the Assignment of Leases and Rents.  Wal–Mart argued that the lease did not allow attorneys' fees for the kind of violation alleged by Wells Fargo and that, even if the lease *did* allow for attorneys' fees, Wells Fargo failed to present sufficient evidence of the amount of fees could reasonably be charged against Wal–Mart to justify an award.

The evidence in support of and in opposition to Wells Fargo's claim for attorneys' fees was extensive.  Many documents were submitted, mostly consisting of monthly billings by the law firms employed by Wells Fargo, and several witnesses testified in a two-day hearing conducted in August, 2005.  Wells Fargo was represented, at different phases of the litigation, by three different law firms, each of which worked, to some extent, on the claims against both sets of defendants.

The initial complaint, filed in March, 2003, was against only the Konover defendants, to recover losses on the loan.  At that time, Wells Fargo was represented by Adelberg, Rudow, Dorf & Hendler, a Baltimore law firm.  The Wal–Mart defendants were added in an amended complaint filed by the Adelberg firm in September, 2003.  That firm submitted bills totaling $502,549, for services and expenses from August 29, 2002, through April 30, 2004.  Of that amount, $479,723 was for fees and $21,828 was for expenses.  In July, 2003, the Dallas firm of Winstead Sechrest & Minik was brought into the case and became the lead counsel.  That firm billed Wells

make the restriction a restraint of trade without any significant economic purpose.

Fargo for $1,023,136 in attorneys' fees and $135,325 in expenses for services performed from July, 2003, through July, 2005. In April, 2004, the Towson firm of Proctor & McKee joined the case as local counsel, in place of the Adelberg firm. The Proctor firm billed Wells Fargo for $452,689 in attorneys' fees and $35,081 in expenses for services rendered from April, 2004 through July, 2005.

The parties agreed on a number of points regarding these billings. They agreed that the gross amount was $2,148,459, which seems to be slightly more than the total derived from the summarized billings of the three firms, but which we accept. They agreed to a deduction from that amount of about $5,000 for fees that were billed to the wrong account and to a "discount" of 15% off of the Adelberg billing, which brought the net billings to $2,068,251. They agreed that the net billing should be divided into three categories: billings for services rendered prior to October, 2003, which is when the Wal–Mart defendants were first added to the case ($256,165); billings for services rendered between October, 2003, and January, 2005, which is when the court, in its partial summary judgment, held that Sam's Club's operation at Golden Ring Mall did not constitute a violation of the radius restriction ($1,373,621); and billings for services rendered after January, 2005 ($438,465). Finally, they agreed that the $256,165 in the first category, prior to October, 2003, was chargeable solely to claims against the Konover defendants and was not to be counted in any award against Wal–Mart.

The disagreement was over how the fees in the other two categories should be allocated between the Konover and Wal–Mart defendants. That disagreement arose from the fact that the monthly statements sent by the three firms, although detailing the individual blocks of time spent and what the time was spent on, did not, in many cases, indicate whether the time, or how much of the time, related to the claims against the Konover defendants or those against the Wal–Mart defendants. There were, of course, in the aggregate, thousands of entries on the bills, ranging from significant blocks of time as long as eleven hours to as little as six minutes.

When asked about the efficacy of a "line by line" review of each entry in order to make an allocation as between the defendants, Andrew J. Graham, Esq., an expert witness who had examined all of the entries, opined that such an analysis would not be reasonable—that "it would take forever" and that "in many cases you would end up concluding that the service really overlapped." Jeffrey Joyce, Esq., testifying on behalf of the Winstead firm, made the same point—that there were thousands of entries, that, although some could be attributed to one claim or another, most related to multiple parts of the case, that it was simply not cost-effective to go through that process, and that, even if one engaged in such an analysis, there likely would be disagreements over how the allocation was made.

In the absence of that kind of "line by line" analysis, which then could be aggregated, the parties looked to alternative methods of allocation. Wells Fargo allocated the amounts in Categories 2 and 3 to the Konover and Wal–Mart defendants equally and gave reasons why it believed that was reasonable.[8] The effect of an equal division was to allocate $686,811 in Category 2 and $219,233 in Category 3 to each set of defendants. Wells Fargo then reduced the $686,811 share allocated to Wal–Mart in Category 2 by 60%, or $412,087, to account for the court's ruling that recovery would not be allowed on the radius restriction claim with respect to the Golden Ring Mall store. That left $274,724 for Category 2, which, together with the $219,233 in Category 3, amounted to a claim for attorneys' fees against Wal–Mart of $493,957.

Wal–Mart proposed that the $1,373,621 in Category 2 be reduced by $71,306 for various reasons, including a disallowance of the cost of having several attorneys at depositions, and that the $438,465 in Category 3 be reduced by $7,392, leaving net amounts in those two categories of $1,302,314 and

---

8. Mr. Joyce claimed that the issues in the claims against Wal–Mart were more complex and that more time had to be devoted to those claims, even though the recovery on those claims was less than that against the Konover defendants.

$431,017, respectively. It then urged that 77% of the $1,302,314 in Category 2 be allocated against the Konover defendants and that only 23%, or $299,523 be allocated against it. It proposed a 60% reduction in that amount to account for non-liability with respect to the Golden Ring Mall store, leaving a viable claim against it of $119,812. Wal–Mart argued that 61% of the $431,072 in Category 3 be allocated against the Konover defendants and that only 39%, or $168,118 be allocated against it. Under Wal–Mart's analysis, it would be liable for $287,931.

The Circuit Court denied all recovery of attorneys' fees, against any of the defendants. The court denied recovery on two alternative grounds: (1) that the lease did not allow such recovery for the kinds of violation found to have been committed by Sam's Club, and (2) in the absence of a "line by line" allocation, the evidence was legally insufficient to establish the amount of fees that could properly be charged to Wal–Mart or the Konover defendants. The Court of Special Appeals disagreed with the Circuit Court's analysis of the lease and held that Section 20 of the Sam's Club lease *did* allow the recovery of attorneys' fees. Wal–Mart has not challenged that ruling by the intermediate appellate court, so we need not address it.

With respect to the sufficiency of the evidence regarding the amount of fees that properly could be awarded, the Circuit Court recognized that the burden was on Wells Fargo to show, by a preponderance of the evidence, that the fees it sought were "necessary and reasonable" and that the factors set forth in Md. Rule of Professional Conduct (MRPC) 1.5 were relevant in that regard. That Rule, which governs what a lawyer may charge his or her own client, requires that the fee be reasonable and sets forth eight factors which, among others, may be considered in that analysis. Those factors, which to some extent we paraphrase, are:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skills requisite to perform the legal service properly;

(2) the likelihood that acceptance of the employment will preclude other employment for the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) time limitations imposed by the client or circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Those factors were argued at the hearing, and the Circuit Court made findings with regard to some of them. It concluded that the Wells Fargo attorneys had "significant experience and solid reputation in commercial litigation," that their presentation of the case "demonstrate[d] their excellent skills," that the litigation was complex, that the hourly rates charged were "reasonable and consistent with or below the market in this region," that the manner in which the fee request was presented was efficient, and that no other method "would have been as inexpensive for clients and the Defendants from whom the fees were sought" or "as efficient in terms of the Court's time and resources." Notwithstanding those findings and the fact that Wal–Mart itself presented evidence that a fair allocation would have produced an award against it of nearly $288,000, the court, "most reluctantly," concluded that it was not possible to find "that fees are reasonable and necessary without undertaking a line-by-line analysis of each legal bill." The court declared that it was impossible to determine from just looking at the bills whether the apportionment between the Konover defendants and Wal–Mart would be fair.

In reviewing the Circuit Court's ruling, the Court of Special Appeals noted our holding in *Bankers & Ship. Ins. v. Electro Enter.*, 287 Md. 641, 661, 415 A.2d 278, 289 (1980), that, when attorneys' fees are claimed as damages for breach of contract, the defendant is "entitled to have the amount of fees and

expenses proven with the certainty and under the standards ordinarily applicable for proof of contractual damages." From a number of out-of-State cases, the appellate court distilled the more specific requirements that "a request for fees must specify the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged" and that "it is incumbent upon the party seeking recovery to present detailed records that contain the relevant facts and computations undergirding the computation of charges," for otherwise, "without such records, the reasonableness, *vel non*, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence." *Wells Fargo v. Diamond Point, supra*, 171 Md.App. at 107, 908 A.2d at 705–06.

Seemingly regarding the Circuit Court's determination that it was "not possible" to find that fees are necessary and reasonable without a line-by-line allocation as a mere preference for such an analysis rather than as a mandate, the Court of Special Appeals held that, rather than deny recovery in the absence of such an analysis, "[t]he court should have compelled Wells Fargo to resubmit the bills for which it sought payment with a clearer indication of exactly what those charges represented." *Id.* at 110, 908 A.2d at 707. Because the appellate court proposed to vacate the partial summary judgment ruling that the radius restriction in the Sam's Club lease was not ambiguous and to remand for further proceedings on that matter, it declared that the Circuit Court would have the opportunity on the remand to reconsider the attorneys' fee issue. The Konover defendants have not complained in this Court about the remand for reconsideration of attorneys' fees. Wal–Mart has carried the torch on that issue, along with Wells Fargo.

We disagree with the Court of Special Appeals analysis but agree with its ultimate conclusion that the attorneys' fee issue must be reconsidered by the Circuit Court. If a party seeking relief, who has the burden of establishing its

right to that relief, fails to produce evidence legally sufficient to sustain that burden, the relief must be denied. Absent some extraordinary circumstance, the party does not get two bites at the apple. It would be unfair, after the issue has been vigorously defended and all of the evidence has been presented, for the court to say, "well, you haven't convinced me, but see if you can get me some better evidence," and it is doubly unfair for an appellate court to insist that a trial court do that. The Circuit Court did not regard the requirement of a line-by-line analysis as a mere preference, but as legal requirement that was not met. If it was correct in that view, its decision must be affirmed.

■ We believe, however, that the Circuit Court was not correct in that view, but was being too rigid. It goes without saying that attorneys who bill on a time basis should make their billings as detailed as reasonably possible, so that the client, and any other person who might be called upon to pay the bill, will know with some precision what services have been performed. In cases where there is no ultimate prospect of having to allocate time or expenses between or among claims, this is a relatively simple matter. In billing for time spent in drafting a complaint or other pleading or in communications with opposing counsel, the client, or anyone else, the parties are not so concerned with how much time was devoted to Count I as opposed to Count II. What is important is identifying the service performed.

■ When that prospect of allocation exists, however, as it would when fee-shifting is possible and likely to be sought, the matter becomes more complex. Some claims may allow fee-shifting while others may not, and the lawyer must be prepared to establish how much time is allocable to the claims for which fee-shifting is sought. Similarly, as here, when separate claims, each allowing fee-shifting, are filed against different defendants, the lawyer must be prepared to establish how much time is allocable to the claims for which fee-shifting is sought against each of the defendants.

A precise allocation is not always practicable, however. In drafting pleadings, motions, discovery, or memoranda that concern multiple claims, possibly against different defendants, it may not always be possible to make a precise allocation of time or expenses among those claims. A deposition, a telephone conversation, settlement negotiations, a court proceeding may involve several claims and several defendants. It is not reasonable to expect the lawyer to have in tow an industrial engineer with a stop watch to measure how much time was devoted to one claim or another. Moreover, as MRPC 1.5 makes clear, time spent is not the only factor in determining reasonableness.

We quite agree that a party against whom a fee award is sought has a right to know the basis of the claim, so that it can be defended, and to require the party seeking the award to establish, by a preponderance of the evidence, that party's right to the amount sought. We agree as well that, where the fee request is based primarily on time spent—a form of lodestar—the best evidence ordinarily would be a clear delineation in the attorneys' billings of the time spent and expenses incurred with respect to the particular claims upon which the fee request is based. Because such a precise delineation may not always be practicable, however, we do not regard it as a *sine qua non* of the right to recover, for to conclude otherwise would, in many cases, deny *all* recovery where *some* recovery is clearly warranted.

Tellingly, both Wells Fargo and Wal–Mart recognized that to be so. Although Wal–Mart offered the legal defense that the lease did not permit *any* fee-shifting, when it came to determining how the net fees should be allocated, it adopted the same format as Wells Fargo: dividing the net aggregate fees, after certain deductions, into three categories, discounting the fees in Category 2 by 60% to account for the lack of success on the radius restriction violation with respect to Golden Ring Mall, and then allocating the remaining net fees in Categories 2 and 3 by percentages. They disagreed on the percentages, but they agreed on the format. Especially in light of Wal–

Mart's evidence showing a liability for nearly $288,000, it was wholly inappropriate for the Circuit Court to deny the entire claim on the ground of evidentiary insufficiency. That is why the case must be remanded.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND TO CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS WITH RESPECT TO WELLS FARGO'S CLAIM FOR ATTORNEYS' FEES IN ACCORDANCE WITH THIS COURT'S OPINION BUT OTHERWISE TO AFFIRM JUDGMENTS OF THE CIRCUIT COURT; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID ONE QUARTER BY WELLS FARGO, ONE QUARTER BY WAL-MART DEFENDANTS JOINTLY AND SEVERALLY, AND ONE HALF BY KONOVER DEFENDANTS JOINTLY AND SEVERALLY.